Johnson *vs.* Dorsey.—1848.

REVERDY JOHNSON *vs.* EDWARD H. DORSEY.—*Dec'r* 1848.

Where a decree required the trustees to give "at least three weeks previous notice, inserted in some newspaper or papers, and such other notice as they might think proper, of the time, place, manner and terms of sale:" HELD, that an advertisement of this sale, inserted once a week for three weeks, and once on the day of sale, in two daily newspapers, was sufficient notice, and that the trustees were not bound to advertise the property daily for three weeks previous to the sale.

A sale regularly conducted, and fairly made under the authority of a court of chancery, where a third party, a stranger to the proceedings, becomes the purchaser, cannot be disturbed on the ground of *mistake*, unless such mistake has been caused by the conduct of the purchaser, or can be traced to the creditor, for whose use the property was sold, or to the trustee.

Where there was a general impression in the community that the sale would be postponed, and this was known to the exceptant, it was his duty to communicate the fact to the trustees, and his failure to do so, would present an insuperable obstacle to the interposition of a court of equity, in his favor, to set aside the sale.

The *English* practice of opening biddings, as a matter of course, before the ratification of the master's report, has not been adopted in *Maryland*, and it is not expedient to introduce it.

The land in this case sold for $12,422.25. HELD, that the court would not be authorised to vacate the sale upon the single ground of inadequacy of price, even assuming the property to be worth $20,000; the estimate placed upon it by the exceptant.

Inadequacy of price, standing by itself, is not sufficient to vacate a sale, unless it be so gross and inordinate, as to indicate some mistake or unfairness in the sale, for which the purchaser is responsible, or misconduct or fraud in the trustee.

APPEAL from the Court of Chancery.

Upon a bill filed by the *Neptune Insurance Company*, of *Baltimore*, the chancellor, on the 18th of May 1843, with the

consent of parties, passed a decree for the sale of certain real estate of one *Rebecca Dorsey*, situated in *Baltimore* county, for payment of a mortgage debt due the complainants. *David Stewart* and *Charles F. Mayer, Esqs.*, were appointed trustees to effect this sale, and the decree directed them to "proceed to make sale of the mortgaged property, having first given at least three weeks previous notice, inserted in some newspaper or papers, and such other notice as they may think proper, of the time, place, manner and terms of sale, which terms shall be," &c.; prescribing the usual terms, one-fourth cash, and the balance in equal instalments, at six, nine and twelve months.

This decree was afterwards entered for the use of the *Baltimore Life Insurance Company*.

On the 21st of April 1847, the trustees filed their report of sale, in which they state, that after due notice by advertisement in daily newspapers of the city of *Baltimore*, they offered the property for sale on the 15th of April 1847. That *Reverdy Johnson*, by the bid of *John S. Gittings*, became the purchaser, at the price of $40 per acre, making for the whole purchase money the sum of $12,422.25. That they had twice before advertised the said real estate for sale, and, on both occasions, the sales, on or shortly before the days appointed, were, at request of *Edward H. Dorsey*, interested in the estate in place of said *Rebecca Dorsey*, deferred; the sale last stopped being one appointed for the 15th of October 1846. The usual oath of the trustees was annexed, that the sale was fairly and *bona fide* made.

With this report was filed, as exhibits, an advertisement of sale, describing the property, &c., proved to have been published once a week for three weeks, prior to the sale and on the day of sale, in two daily newspapers of the city of *Baltimore*.

Also two letters, dated the 15th of October 1846, directed to the trustees, the one from *Edward H. Dorsey*, in which he says, "the sale advertised by you, as trustee, being postponed from this day, at my request, the commissions and expenses are to be paid, as in case of a sale;" the other from *John J. Donaldson*, the president of the *Baltimore Life Insurance*

*Company,* for whose use the decree had been entered, request-ing a postponement of the sale until further notice.

On the same day, (21st of April 1847,) the usual order of ratification *nisi* was passed by the chancellor; and on the 21st of June following, being the day on which the sale stood for final confirmation, objections were filed to its ratification by *Edward H. Dorsey,* who alleged himself to be the owner of the equity of redemption in the property sold under the decree: 1st. Because the price for which the same was sold is grossly inadequate, said property being fully worth $20,000. 2nd. Because proper and reasonable notice of said sale was not given. 3rd. Because there was no attendance of bidders at said sale, and no competition, in consequence of which said property sold far below its value, as stated in the first excep-tion. 4th. Because various persons, who were anxious to pur-chase said property, and would have given, and would now give, a much larger price for the same, (one of whom, *J. McHenry Boyd, Esq.,* a responsible person, would have given, and would now give, from $18,000 to $20,000,) were prevented from attending said sale by some mistake or misun-derstanding in relation thereto, by reason whereof said property was sold far beneath its value.

On the 24th of the same month, his honor, *Nicholas Brewer,* an associate judge of the third judicial district, to whom the proceedings had been certified by the chancellor, (*Johnson,*) passed an order finally ratifying and confirming the sale, after stating that the paper filed by *Edward H. Dorsey,* objecting to the sale, was signed by him, but that there was no affidavit by him or any other person, of any of the facts therein stated, nor any order asked for to take testimony to prove them.

On the 3rd of July following, a petition in due form was filed by said *Dorsey,* re-asserting substantially the same objec-tions to the sale, and more at large, alleging, "that from want of proper and sufficient notice by advertisement, and from the impression getting abroad that said land was not to be sold, persons were prevented from attending or from bidding at said sale, who would have given from $18,000 to $20,000 for said land. That said trustees only advertised said sale once a week

for three weeks, and once on the day of sale, in two daily newspapers in the city of *Baltimore.* That *James McHenry Boyd, Esq.*, a gentleman of large fortune, was desirous to become the purchaser, and would have given more than $18,000 for said property, but he had heard that the same would not be sold, and to satisfy himself of the fact, looked at one of the numbers of the paper in which the sale was advertised, and not finding the advertisement, supposed the same was withdrawn, and that the sale would not take place, and therefore did not attend the same. That *Stephen Thompson, Esq.*, of *Baltimore* city, was present at the sale for the purpose of bidding, but believing that there was but one person bidding, and that said land was being bid in for the benefit of your petitioner, did not bid for the same, but has declared said land ought to have brought, at least, from $60 to $75 per acre, and he would have given a much larger price than that for which it actually sold. That there were not more than five or six persons at said sale, and that there were no bidders. To show the gross inadequacy of price at which said land was sold, your petitioner states, that he has been informed and believes, that the person who attended said sale and bid for *Reverdy Johnson, Esq.*, the purchaser, was authorised to give over $18,000 for the land, and that soon after the sale, the purchaser was offered an advance of $8000 for said farm. That if an opportunity were offered, he could furnish proof of all the facts stated in this petition, and of the objections previously taken to the sale; and could also show, that he is the sole person interested in said land, except the mortgagee, for whose benefit it was sold The petition then prays, that the order of ratification may be opened, and an opportunity afforded for producing proof, and the trustees be required to answer said exceptions, and said sale set aside and a new one ordered, and for general relief.

This petition was verified in due form and accompanied by the affidavits of *seven* deponents, who resided in the neighborhood of the property, were well acquainted with it, and who severally state that it sold for much less than its actual value. The estimates of its value by these deponents vary from $60 to $75 per acre.

Upon this petition an order was passed rescinding the order of ratification, setting down the objections for hearing, with leave to the parties to take testimony before a justice of the peace, upon the usual notice, and ordering the trustees to file their answers on or before a day certain.

The *answer* of *David Stewart*, one of the trustees, states: That he was prevented by sickness from attending the sale, but under the circumstances, would have acted as his associate trustee did, in making said sale, even at the very low price at which it was made; no discretion being allowed to the trustees, by any assent of the mortgage creditor, who was urging the sale, and it having been within respondent's particular knowledge, that the postponement of the sale, on the 15th of October 1846, had been assented to by the creditor, upon the undertaking of *Dorsey*, that no further delay should be asked for than that then agreed to be given, which was until the 15th of April 1847, and that in his view, therefore, the trustees had no right to afford any further delay, except with the consent of the creditor; and under the circumstances, respondent regarded the sale, appointed for the 15th of April 1847, as a peremptory sale.

Respondent further says, that in his opinion the property was then worth at least $20,000, and is now worth that amount; and this opinion is formed, in part from the price which respondent and his associate trustee obtained, for a portion of the same property, sold at private sale, to *Charles H. McBlair*, at the rate of $75 per acre. This portion consisted of 80 acres, and was unimproved by buildings. He believes sufficient notice was given of the sale, by public advertisement, but he believes also, that there was a general impression among persons who otherwise might have been disposed to attend the sale, that some arrangement would be made, and that the sale would not proceed, how this impression originated, respondent cannot say, but it seemed to be a prevailing and accredited impression.

*Charles F. Mayer* the other trustee, separately answering, states, that the sickness of his co-trustee, devolved upon him the duty of conducting the sale alone. That said sale was

35     v.7

appointed positively to take place, (after at least one postponement, and considerable delay on the creditor's part;) that respondent found on the day of sale, that the creditor, the *cestui que use* of the decree, was peremptorily resolved upon having a sale made, and in consequence, respondent felt himself under a peculiarly strict obligation to effect a sale, even at a price materially beneath respondent's estimate of the worth of the property. With this persuasion of his duty, and under pressure of such a requirement, however painful the position, or the act, respondent allowed the estate to be struck off at the price of $40 per acre, as the highest bid, although if left to his own discretion, and to conform to what he deemed the reasonable valuation of the property, he would not, he believes, have allowed it to be sold at a less price than $60 per acre, that even, being less than respondent deemed it actually worth. In illustration of its value, respondent refers to the sale adverted to by his co-trustee, in his answer, which with other reasons, tended to impress upon respondent the worth of said property. He cannot say how many bids there were, but believes there were not many, he knowing of only two bidders, although from the manner of conducting auctions, there might have been more, without respondent's knowing the fact. The persons attending the sale, did not number more than ten or twelve; the two bidders referred to being *John Patterson* and *John S. Gittings,* the latter, the highest bidder, and the former making only one bid, at the beginning of the auction. He further states, that notice of sale was given by advertisement in *Baltimore,* once a week, for three weeks, and on the day of sale, in two newspapers of that city, and as respondent believes in no more. Respondent believes, that at the time of said sale, said estate was fairly worth from $65 to $70 per acre, and that it is now worth that much.

The following is a brief summary of the testimony taken under the above order.

On the part of the exceptant, it was proved, by *James McHenry Boyd,* that witness knows the property in question, by reputation; he intended to attend the sale, and bid for the property, but was prevented, by being informed that the sale

would be postponed. Deponent saw the advertisement; but after first seeing it, had been absent from town for some time, and had forgotten the precise day fixed for the sale. On his return, he enquired of one of his cousins, whether the day of sale were not at hand, who answered to the effect, that she had learned from the family of *Dr. Waters*, a neighbor of *Mr. Dorsey*, that the sale was postponed for a month, and witness then dismissed the subject from his mind. After receiving this information, he did not examine the paper with reference to the advertisement. He did occasionally look over the paper, but did not observe it. His reliance on his cousin's statement, coming directly from the friends of *Mr. Dorsey*, was such as to prevent him from making any further inquiry as to the time of sale, and to induce him to dismiss the matter from his mind. If deponent had attended the sale, he would have given $60 per acre for the property. He has no hesitation in stating, that if circumstances were such, that he was now free to be a bidder, he would now give that amount for the property. If the property were to day in the market, and could not be bought for less, he would give that amount for it. Deponent believes the market value of the property to be at least $60 per acre. His opinion is formed from what he knows of it, and from the opinions which he has heard others express, on whose judgment he relies.

*William E. Thomas*, is acquainted with the property, and has been repeatedly on it. Its value at a low estimate is $60 per acre. Deponent thinks this would be a low price at which to purchase the property at public sale. His opinion is derived from his knowledge of the place, it being good farming land. He does not consider the land in a good state of improvement. If the land were well farmed, and the improvements in a good condition, the property would be worth $100 per acre. He estimates the value of the place at $60 per acre, in its present condition.

*Daniel Warfield*, knows the property by reputation. Did not attend the sale, because there was always so much contention about it, that he did not suppose the property would be sold. It has been in the market several years, and frequently

withdrawn, and he supposed that *Mr. Dorsey* would not suffer it to be sold, if he could avoid it; would not have bid for the property, unless he could have been assured that *Mr. Dorsey* would have given peaceable possession, and there would have been no contest about it. Cannot say what is its value, but from representations he too had of it, he would give $50 per acre, could he have been assured *Mr. Dorsey* would have given peaceable possession. Deponent offered *Mr. Gittings* $50 per acre for the property, a short time after the sale.

*Stephen J. Thompson*, knows the property, has several times gone around the place, and examined it, with a view of acquiring information as to its value, with the view of purchasing it. Attended the sale, but did not bid, because he was of opinion, as he believes some others were, that the property would not be sold; was strengthened in this opinion from having at various times attended, when the same property had been frequently advertised for sale; on one occasion, neither trustee or auctioneer appeared, and on others, the property had been withdrawn. From the small number, in attendance on the day of sale, deponent came to the conclusion, that the property would not be sold, but had no right to doubt the sale was a real one, after *Mr. Gittings* was called on by the auctioneer to sign. His previous impressions were, that it was bought in for *Mr. Dorsey*. These impressions did not arise from any thing which had been said by *Mr. Gittings*, the trustee, or the auctioneer, but from what had taken place on former occasions, when the same property had been advertised; from the small number in attendance, and from the low price which the property brought. During the offering, *Mr. Dorsey* passed through the exchange, but did not remain; he did not appear concerned about the sale, and did not remain until it was closed. The property was started by *Mr. Patterson*, at $10,000. Deponent does not recollect of hearing any bid after that, until *Mr. Gittings* bid. The auctioneer stated, that the property would not be sold at less than $40 per acre, he having prior to that statement, called the property at $39.50 per acre, but deponent did not believe there was any bid, as he did

not hear one. His impression was, that the $39.50 bid, was that of the auctioneer.

From all the circumstances attending the sale, his impression was, that the property was bought in for *Mr. Dorsey.* Had it not been for that impression, he would have bid for the property, as he went to the sale for that purpose. He would have advanced on $40, the price at which the property was knocked down. Deponent thinks that at a fair sale, the property should have brought $60 per acre. He knows of a sale of property in the same neighborhood, made since the sale in this case, on which there was a very inferior dwelling house, with good out-houses, the soil naturally inferior to *Mr. Dorsey's,* but more highly cultivated, at $61 per acre, at public sale. *Mr. McBlair* bought 80 acres of the original tract, of an inferior quality to *Mr. Dorsey's,* without any improvements, at $75 per acre. This purchase was made by *Mr. McBlair* for a county residence, and one inducement was on account of the location, its fine prospect. The prospect from *Mr. Dorsey's* is superior to that from *Mr. McBlair's.* It is one of the most beautiful in *Baltimore* county.

*John Swan,* is familiarly acquainted with the property, lives on the adjoining farm, knows the quality of the soil, and its present state of cultivation, considers it land of excellent quality. It has been recently neglected, but with proper management and cultivation, would be easily restored to its original value. The situation is a very fine one. The property in its present condition, is fully worth $25,000. Deponent was at the sale, thinks *Mr. Patterson* started the sale at $10,000, heard and saw no more bidding. The auctioneer called out various sums, until he reached $34, *Mr. Gittings* then offered an advance of fifty cents. The auctioneer then remarked, that he had omitted to state at the beginning, what he ought to have done, that the property would not be sold under $40 per acre. At this moment, *Mr. Dorsey* called deponent out, to intercede with *Mr. Donaldson,* stating, that until within half an hour of the sale, he had confidently expected to procure the money; before deponent returned, the sale was closed. *Mr. Dorsey* did not continue at the sale, he was alternately

in and out, endeavoring to obtain some intercourse with *Mr. Donaldson.*

*George Myers,* owns a place on which he resides, nearly adjacent, and is familiar with *Mr. Dorsey's* property; has known it for forty years; thinks, in its present state, it is worth $80 per acre. If deponent were desirous of purchasing, he would willingly give that amount for the property.

*Henry H. Williams,* a few years ago, bought from *Mr. Dorsey* a portion of the original tract. Thinks the property ought to bring $25,000. In 1840 or 1841, deponent, who had the authority to sell it, was offered $25,000 for it, but *Mr. Dorsey* was not willing it should be sold at that price, stating that he could obtain a better price. In 1841 deponent sold a part of the original tract, at $62 per acre, on which there were no improvements or fencing.

*James Powers,* is a farmer, resides in the neighborhood of the property; has known it ever since he can remember; it has been one of the best farms in *Baltimore* county. The dwelling house is a fine one, in good order. There is a choice supply of spring water of good quality on the place. In its present state the property ought to bring, at least, $75 per acre.

*John Moke,* is a farmer, resides about four miles from *Mr. Dorsey's;* has been a property agent in *Baltimore* county for some time; has known the property for upwards of forty years; it is considered one of the best farms in that section of the county. As it stands, deponent cannot put the value of the property at less than $75 dollars per acre: he thinks it ought to bring that price at public or private sale.

*Peter W. Gibbons,* is a farmer, lives about six miles from *Mr. Dorsey;* has known the property for twenty years; would suppose that, at a fair sale, any day, it ought to bring from $70 to $75 per acre.

*Charles H. McBlair,* resides on the place adjoining *Mr. Dorsey's,* being part of the original tract. Deponent has eighty acres, which he purchased of *Mr. Dorsey* in 1843. He gave $75 per acre for it. This property, at that time, had no buildings or improvements on it, and the fences were in a bad condition. Thinks *Mr. Dorsey's* farm, in its present condition, is worth from $18,000 to $20,000.

*John S. Gittings,* attended the sale on behalf of *Mr. Johnson,* by whom he was authorised to bid as high as $60 per acre. After the sale, he was called upon by some individual, with whom he was not personally acquainted, who said, that if the title was clear, he would give an advance of $2000 on the purchase. *Mr. Warfield* offered deponent, if the title were clear, an advance of some small sum on the purchase. *Mr. Johnson* informed deponent that he expected to get the property for $40 per acre, but had made up his mind to give $60 per acre.

*John Patterson,* was the owner of a mortgage on the property; was present at the sale; went merely to cover his claim; made a bid of $20 per acre for that purpose. *John H. Ormdorff* designed purchasing the property, but did not suppose it would be sold, as he had spoken to several persons about it and had been informed it would not probably be sold, as *Mr. Dorsey* would make arrangements to pay off the mortgage. Thinks he saw the advertisement in the *American.* Would have given much more than the property sold for; would have given $20,000 for it, but relying on the information he had received, he did not think it necessary to go to the sale or examine the property.

*Henry W. Bool, Jr.,* was the auctioneer who made the sale. Thinks there were other bids, besides the starting bid by *Mr. Patterson,* and that made by *Mr. Gittings.* Thinks so from the price at which the property sold. After the sale, a gentleman told deponent, that if he had been at the sale he would have given about the amount the property sold for. Thinks he called the property at $39 per acre. He then called *Mr. Mayer* to the stand, and after consultation with him, announced, that if he could obtain $40 per acre, the property would be sold. *Mr. Gittings* bid that price and the property was knocked down to him. Prior to the sale, deponent had a conversation with *Mr. Mayer,* in which he stated to deponent, that the property ought to bring $40 per acre at least. Deponent thinks he made a bid on behalf of the trustees, near the amount of $39.

*Messrs. Gittings, Patterson, Swann,* and, including them, from thirty to forty persons were present at the sale. The sale was a fair one. Deponent did his endeavors to get the most he could for the property, he hung longer on *Mr. Gittings'* bid than he ought to have done. The company in attendance was the usual number. There never is a larger attendance at sales at the *Exchange,* except on extraordinary occasions.

On the part of the purchaser, it was proved by *John J. Donaldson,* (whose testimony was objected to by the exceptant,) that he is the president of the *Baltimore Life Insurance Company,* the assignee of the claim for which the property was sold. He attended the sale. The property was offered in the presence and by the direction of deponent. As the sale was about to commence, *Mr. Dorsey* made application to deponent to suspend the sale, for the purpose of giving him time, which deponent refused, as the sale had been previously postponed. Deponent required the trustee to go on with the sale. The property had been advertised, at deponent's instance, in the autumn of 1846. At the instance of *Mr. Glenn* and *Mr. Dorsey,* who promised that the matter should be settled up in six months, the sale was postponed, and time was given to *Mr. Dorsey* to sell at private sale, which he stated was his object. Deponent then told him, that the property would be sold at the end of that time if the matter were not settled. Deponent did not see *Mr. Dorsey* from that time to the last day of sale.

*Hugh Gelston,* on the 31st of October last, purchased a part of the same tract of land, consisting of thirty acres, at $36.50 per acre. There are no improvements on it, not even a fence. The soil is of a very good quality. It is on a point difficult of access. Separate from the consideration of great beauty of situation, and speaking in reference only to agriculture, and the expenses of putting the farm in order, deponent would consider many farms that have been sold within the last two years as good bargains as this one purchased by *Mr. Johnson;* deponent is not, however, taking into consideration in the above estimate of the value of the land, its advantages of location, for beauty of building sites, and nearness to the city; these things greatly enhance the market value of property. Taking these qualities

into consideration, deponent thinks the land ought to bring much more than it sold for.

*John S. Gittings,* recalled for the purchaser, states, that he has, within a few days, made a purchase of about two hundred acres of land, at $45 per acre. This land is about a mile further from the city than *Mr. Dorsey's,* both lying west of the city. The soil perhaps is not so good, but it is heavily timbered. It is red land. There is a considerable quantity of stone, fit for paving, on it, which was one inducement for deponent to purchase it. There are no buildings or improvements on this property. Deponent thinks if the place purchased by him were fairly brought into the market, it would bring as much per acre as that of *Mr. Dorsey's.* As a country residence, *Mr. Dorsey's* place is one of the most beautiful situations in the neighborhood of *Baltimore.* Deponent did not expect to give more for the property than about $40 per acre. During the sale, there were about thirty persons present in the rotunda of the *Exchange.* There was a small number about the stand, near the auctioneer, who appeared to be taking an interest in the proceedings. Deponent supposed that the bids for the property were real, until it had reached the bid of $37 per acre. He bid $36, and the auctioneer bid $37, which deponent thought a bid of the auctioneer.

A deed was also filed in the cause from *Rebecca Dorsey,* conveying to the exceptant the equity of redemption in the land, dated the 15th of February 1844.

On the 29th of July 1847, the following order was passed by his honor, *Judge Brewer,* acting as chancellor:

Objections were filed in this case to the sale made on the 15th of April 1847, but the sale was ratified, because the objections were entirely of matters *in pais,* not signed by counsel, and not vouched by the affidavit of the persons objecting, or of any other person, and being filed in that manner, and on the day before the time for final ratification, the whole proceeding had the appearance of a mere design to delay the ratification. On a proper application, the order was rescinded, the trustees directed to answer the petition, and testimony directed to be taken, which was taken and returned, the trustee's answers

36    v.7

·filed, and the case heard. The 2nd objection, "because proper and reasonable notice of the sale was not given," is of no moment, as the notice which the decree required was given, and there is no evidence, that it was the custom to give any further notice in the case of sales in *Baltimore*, or in advertisements in the *Baltimore* daily papers.

The 1st objection is, gross inadequacy of price.

3rd. No competition at the sale.

4th. That persons who would have given a much larger sum for the property, were prevented from attending the sale by some mistake or misapprehension in relation thereto. The property sold for $12,000. The proof of its value varies from $50 to $80 per acre, and, on a fair average of the proof, it is worth nearly about $70.

The sale appears to have been conducted in the ordinary manner, without the least appearance of unfairness, which, indeed, the petitioner does not pretend to charge, and the property bought by an agent for the actual purchaser, and at auction at the *Exchange*, where such property is frequently, if not generally, sold. The practice of opening biddings has never prevailed in this State, and has not been contended for in this case. The principles which are to govern in its decision, seem to be well settled by abjudications of our own courts. In the case of *Lawson vs. The State*, 2 Bl. Ch. Rep., 639, *Chan. Hanson* says: "That he will never, knowingly, ratify an unreasonable sale." In page 644, he says, "with respect to sales under the authority of this court, the chancellor thinks himself bound to act as if the property was his own, or held by him in trust;" that is to say, he thinks that reasons that would induce him, as proprietor or trustee, to set aside a sale made by his agent, should determine him, as chancellor, to refuse his approbation to a sale made by a trustee. Again, he says: "It is, undoubtedly, one object of each decree for a sale, to obtain the best price that can be obtained, consulting, at the same time, justice to all persons concerned, and attending to their wishes, as far as may be consistent with justice." In the case of *Goodwin vs. Scott*, Bl. Chan. Rep., page 647, *Chan. Kilty* says: "In this State it has been repeat-

edly declared, that in sales under a decree of this court, which are made subject to the chancellor's approbation and ratification, any circumstances showing that such sales are injurious to the complainants, or that better sales might reasonably and probably have been made, are sufficient to set them aside. This principle, to be just, should be reciprocal and mutual.''

*Chan. Bland*, in the case of *Andrews vs. Scott, page* 644, *2nd vol.*, adopts these opinions, and says further: ''That in this State, as well as in *England*, if there should be made to appear, either before or after the sale has been ratified, that there was any injurious mistake, the reported sale may be rejected; and again, ''If, in any case, the trustee reports that there was an error, mistake, misunderstanding, and as to the terms or manner of the sale, it may be rejected at once.'' In the case of *Glenn vs. Clapp*, 11 *G. & J.*, 9, this subject came before the Court of Appeals. In that case the property sold for $490, and was alleged to be worth $900, but the only evidence of value was the answer of the trustee. He says that the property was worth more than $490, but not $900; but supposing that to be the real value, the inequality in that case and this is nearly about the same. The property in both cases sold for rather more than half its value.

The court say, in their opinion, that they will not set aside a sale for inadequacy of price merely, unless the sum reported by the trustee is so grossly inadequate, as to indicate a want of reasonable judgment and discretion in the trustee; what proportion of the real value would be that gross inadequacy, or indicate that want of reasonable judgment and discretion, the court do not say, but seem to intimate, that it does not seem to exist in the case before them, and only admit it as a reduced price, to be viewed in connexion with some other just cause, to doubt the propriety of the sale. In cases of purchase and sale by and from individuals, where applications have been made to set aside sales for inadequacy of price, the proportion of the real value has not been definitely fixed, though in one case the rule of the civil law is said to have been adopted, by which no consideration was deemed inadequate, that exceeded half the real value of the estate, *Sugden on Vendors*, 249;

and the principle was held in another, not to apply to cases of sales by auction, which the Court of Appeals seem to intimate in the case of *Magruder vs. Peter*, 11 *G. & J.*, 244. In those cases the inadequate consideration was considered an evidence of fraud. In cases like the present, it is only treated as an indication of want of reasonable judgment and discretion in the trustee, and perhaps would not therefore require so gross an inadequacy. It is not easy to determine how far the trustee should extend his discretion, but it may be considered a good general rule, not to sell the property at a great sacrifice; more especially on the first effort to sell, but to report the circumstances to the court for directions. In this case, the low price did not indicate that want of reasonable judgment and discretion as to the value, for the answer of one of the trustees shows, that he was well aware that he was selling too low, but thought himself bound to sell, as he was required to do so by the complainant; and it is of this that the petitioner's counsel complained in the argument, as a dereliction of duty or want of consideration in the trustee, contending that he had no right to consult the complainant at all, but should insist on getting what the property was worth. This, however, is going too far; the trustee did fix a limit below which he would not sell, although it should be required by complainant, and in fixing that limit, no doubt considered that his estimate of the value though much higher, might not agree with the estimate of others. There certainly is no impropriety in consulting the parties interested in the sale, or any of them, but the trustee ought to exercise a reasonable discretion and not be governed by either party. There are other circumstances in this case, which, viewed in connexion with the low price for which the property sold, and the fact of the trustee selling against his own opinion, at the instance of the complainant, disclose sufficient grounds for doubting the propriety of the sale, and for setting it aside. First, there was no competition whatever, as is clearly proved, and secondly, there was evidently a mistake as to the sale taking place, which prevented a bidder from attending who wished to attend, and who would have given a much higher price for the property. It is contended for the pur-

chaser, that this mistake was designed and caused by the petitioner himself, who spread the report that the property would not be sold, but this does not accord with the proof; the information was derived from a neighbor or friend of the petitioner, who did not profess to have received the information from the petitioner; and it was further proved, that this person who proposed to purchase, did not see the advertisement in the paper, and was informed it was not there; and it is also stated by one of the trustees in his answer, that he believes there was a general impression among persons, who otherwise might have been disposed to attend the sale, that some arrangement would be made. The purchaser, however, who is not in fault in any respect, is entitled to his costs.

It is thereupon, this 29th day of July 1847, adjudged and ordered, that the sale made on the 15th day of April 1847, be and the same is hereby set aside and annulled, and the petitioner is ordered to pay to the purchaser his costs, to be taxed by the register.

From this order the purchaser appealed to this court.

The cause was argued before DORSEY, C. J., SPENCE, MARTIN, MAGRUDER and FRICK, J.

By ALEXANDER and McMAHON for the appellant, and
By FARNANDIS and NELSON for the appellee.

MARTIN, J., delivered the opinion of this court.

This case comes before the court, upon an appeal from an order of an associate judge, of the third judicial district, sitting for the chancellor, vacating a sale made to the appellant, on the 21st of April 1847, under a decree of the chancery court.

It appears from the record, that objections to the ratification of this sale, were interposed by the appellee, prior to its confirmation. But they were not sustained by the affidavit of the exceptant, or verified by that of any other person, and in this predicament, they were disregarded by the judge, to whom the application was preferred, and the sale ratified on the 24th of June 1847.

This order was, however, subsequently rescinded, and in considering therefore, the questions presented on this appeal, they are to be treated as uninfluenced by a final order of ratification.

The objections to the validity of this sale, as filed below, and relied upon in the argument of the cause, before this court, are in substance, as follows:

1. Because notice of the sale was not given, as required by the terms of the decree.

2. That in consequence of some mistake or misunderstanding, prevailing in the community, that the sale would not take place, various persons, who were desirous of purchasing the estate in question, were prevented from bidding for the same, and that in this way it was sacrificed.

3. That in consequence of this mistake, or misunderstanding, there was in fact, no competition at the sale.

4. That the price at which the property sold, was grossly inadequate.

There is no force in the *first* objection. By the terms of the decree, the trustees were required to give, "at least three week's previous notice, inserted in some newspaper or papers, and such other notice as they might think proper, of the time, place, manner and terms of sale," and the appellee has, in is petition admitted, that the trustees advertised this sale onceh a week for three weeks, and once on the day of sale, in two daily newspapers in the city of *Baltimore* This certainly was legal notice of the sale. It is a misconception of the character of the decree, to suppose, that it imposed upon the trustees the obligation to advertise the property daily, for three weeks previous to the sale. The language of the decree does not warrant such a conclusion. And we should be indisposed to countenance a construction, which would operate most severely and injuriously upon the interests of a debtor, already embarrassed, by subjecting him to an onerous and useless expense.

The *second* objection is equally untenable. The appellant is a stranger to the controversy in which this proceeding originated. His position is that of a party, who having purchased

in good faith, an estate, at public sale, regularly conducted and fairly made, under the authority and supervision of the court of chancery, now claims to have his contract ratified, as obligatory on both parties. And in a case thus situated, it is perfectly clear, that the sale cannot be disturbed upon the ground of *mistake,* unless the mistake has been generated by the conduct of the purchaser, or can be traced to the creditor, at whose instance, and for whose use, the property was sold, or to the trustee to whom the control and management of the sale was confided.

The *American* cases are full and conclusive on this point; and the proposition is sustained by the most eminent of the *English* Chancellors, whose opinions are to be received as illustrative of the law upon this subject, when expressed with respect to applications for opening sales, after their absolute confirmation.

It will be found by consulting the authorities, that this principle is firmly established, not only as a rule of public policy and convenience, but one in which the debtor himself is directly and deeply concerned, as a means of rendering these sales productive, by imparting to them the character of permanence and security.

The principle is thus correctly and clearly stated by the vice chancellor, in the case of *Woodhull vs. Osborne*, 2 *Edward's Rep.*, 616.

"Where a stranger or third person becomes the purchaser in good faith, something more than a mere offer of a higher price must appear, to induce a re-sale: Such as fraud or misconduct of the master, or other person, having the control of the sale, or surprise upon the party interested, or his having been misled as to the time and place of sale. Where circumstances of the latter description are relied upon, the party must show they proceeded from or were caused by the purchaser, or some person connected with or having the management of the sale. If he be of full age and under no disability, he cannot be permitted to allege his own negligence or inattention, as the cause of his surprise or mistake."

In *Collier vs. Whipple*, 13 *Wend.*, 226, *Mr. Justice Nelson*, after citing, with approbation, the cases of *Morrice vs. Bishop of Durham*, 11 *Ves.*, 57, and *White vs. Wilson*, 14 *Ves.*, 151, says:

"These cases, without going further, sufficiently shew that fraud or misconduct in the purchaser, or fraudulent negligence in any other person connected with the sale, as the agent of the mortgagor, or of persons interested as judgment creditors, and also surprise created by the conduct of the purchaser, will induce the court to open the biddings." And at page 228 of the opinion, he distinctly expands the rule so as to embrace the master;—correctly maintaining, "that surprise created by him on his conduct, is as injurious and as available in an application of this kind, as if caused by a purchaser; which all the cases concede is sufficient."

In *Gardiner vs. Schermerhorn*, 1 *Clarke's Rep.*, 103, the language held by the vice chancellor, is equally strong.

And in the case of *Williamson vs. Dale*, 3 *John. Ch. Rep.*, 292, the chancellor, in setting aside a sale, on the ground that the defendants were misled, though unintentionally, by the language of the plaintiff and his solicitor, said: "That he was not influenced by the alleged inadequacy of the auction price, and that in disturbing the sale, he pushed the doctrine to the utmost verge of an admissible interference."

In *Morrice vs.* the *Bishop* of *Durham*, 11 *Ves.*, 57, *Lord Eldon*, after animadverting upon the decision of *Lord Commissioner Ashhurst*, in *Watson vs. Birch*, 2 *Ves.*, *Jr.*, 51, said:

"That the only case in which the biddings can be opened, after confirmation of the report, is, where there is some fraud or misconduct in the purchaser, or fraudulent negligence in another person, as the agent, of which it is against conscience that the purchaser should take advantage." *White vs. Wilson*, 14 *Ves.*, 151.

It cannot be pretended in this case, that the mistake, of which the appellee complains, is to be attributed to the conduct of the creditor, the trustees, the vendee, or their agents, and upon the doctrine enunciated in the cases to which we

have referred, the purchaser is not to be treated as accountable for the consequences of the alleged mistake, however injuriously it may have operated upon the sale.

But what is the nature and origin of this alleged mistake? *Mr. Stewart* in his answer to the petition of the appellee, states:

"That he believes sufficient notice was given of the sale, which was by public advertisement, but he believes also, that there was a general impression among persons who might otherwise have been disposed to attend the sale, that some arrangement would be made, and that the sale would not proceed. How this impression originated he cannot say, but it seemed to be a prevailing and accredited impression."

How the impression to which the trustee refers, arose, or by whom it was propagated, is not distinctly disclosed by the testimony in the cause. But when it is recollected, that the exceptant, at the time he solicited the intercession of *Mr. Swann* with the creditor, for the purpose of arresting the progress of the sale, stated, "that until within half an hour of the sale, he had confidently expected to procure the money," the inference is legitimate, that the impression, mentioned by the trustee, "that some arrangement would be made, and that the sale would not proceed," was generated by the debtor himself, under the hope, sincerely and honestly entertained, that he would be able before the sale to raise a sum, sufficient for the payment of the mortgaged debt, and that in this way the sale would be arrested.

At all events it is difficult to believe under the circumstances of the case, that this impression in the community to which *Mr. Stewart* refers, was not known to the exceptant. If so, it was his plain and imperative duty to have communicated its existence to the trustees, that they might have guarded the sale against its influence, and an act of such remissness and negligence on the part of the debtor, would be regarded, irrespective of other considerations, as presenting an insuperable obstacle, to the interposition of a court of equity.

It was indeed contended by the counsel for the appellee, that the knowledge of this impression was in the possession of

37    v. 7

one of the trustees, prior to the day of sale, and that he was obnoxious to the charge of a gross dereliction of official duty, by not adopting in connection with his co-trustee, such means as might be necessary to disabuse the public mind of this error, before the property was exhibited at public auction. But there is no foundation for this imputation. It is perfectly apparent on a fair construction of the answer of *Mr. Stewart,* that the information referred to, was not acquired by him until after the sale.

The *third* objection is in the following words: "Because there was no attendance of bidders at the said sale, and no competition, in consequence of which the said property was sold far below its value." This exception literally interpreted is of course in conflict with the undisputed facts in the cause, but the point of the objection is, that in consequence of the impression before referred to, with respect to the arrangement of this debt, and the arrestation of the sale, the sale was depressed, and competition prevented.

We have already seen, that the appellant is not to be considered as responsible for any injurious consequences, which may have resulted from the prevalence of this mistake.

But is it true, as maintained by the counsel for the appellee, that competition was hindered, and that persons disposed to become the purchasers of this property, were discouraged from bidding by a mistaken impression, that the sale would not proceed?

We think not. *Mr. Boyd,* certainly, was not detained from the sale, from any misapprehension of this kind. Notwithstanding he was informed by notice in the newspapers, that the sale was appointed for the 21st of April, he declined to attend, upon information derived entirely from those who lived in the vicinity of the appellee, that the sale would be postponed for one month. And upon this intelligence he acted, without seeking to be correctly informed upon the subject, by reference either to the debtor, or to the trustees. It is scarcely necessary to say, that to disturb a fair sale upon a ground like this, would be without precedent, and of the most mischievous ten-

dency. The absence of this gentleman from the sale, was obviously the result of his own remissness.

It appears from the testimony in the cause, that among the persons assembled at this sale, there was at least one of those gentlemen designated by the exceptant as disposed to become the purchaser of the property, at a larger price than that which was obtained for it.

Why, then, were there not more bidders?

The auctioneer after consulting with the trustee, announced his determination not to sell the property, unless forty dollars an acre was offered for it. This communication was calculated to stimulate competition. It was an annunciation that the sale was not formal,—that it would proceed,—and apprised those interested in the purchase, that it would be sold at forty dollars an acre, unless more was bid for it. The auctioneer states, that he paused upon the bid of Mr. Billings, "longer than he ought to have done, under the hope of getting an advance." And yet there was no proposition of advance upon that bid.

Under such circumstances, it is difficult to resist the inference, either that the property was not considered as intrinsically worth more than the sum offered for it by the agent of the appellant, or that there was an invincible repugnance to purchase this estate, in opposition to the wishes of the debtor. The testimony of one of the witnesses on this point, is exceedingly significant. He says, *"that he does not know the property, but if there had been no contention,* and he could have obtained *peaceable possession,* he would have given for it fifty dollars per acre."

The last objection raises the question with respect to the alleged inadequacy of the auction price, at which this property was sold.

The testimony on the question of value, in this case, is chiefly composed of the opinions of witnesses, familiar with the property. But nothing can be more precarious and uncertain as a standard of value, than that created by these diversified and speculative opinions. Each opinion is constituted of different elements, depending upon the taste, habits, pursuits, and feelings of the witness.

The *English* practice of opening the biddings as a matter of course, before the ratification of the master's, report has not been adopted in *Maryland.* We have said in a former case, that it is not expedient to introduce it here. But if the biddings are to be opened, there is wisdom in the *English* rule, acted upon in the chancery courts of *New York,* which provides, that a resale shall not be ordered, unless there is an actual advance upon the original bid.

The true test of value in these applications is to be found in the inquiry., with respect to the sum which the property would produce in the market upon a resale, and on this subject we have no reliable information, as there has been no proposition of an advance on the sum bid for this estate by *Mr. Gittings.*

It is however not necessary to pursue this inquiry. We are perfectly satisfied, that according to the doctrine now settled by an unbroken series of adjudged cases, that assuming this property to be worth the sum of twenty thousand dollars, the estimate placed on it by the exceptant, but to which we do not accede, the court would not be authorised to vacate the sale, upon the single ground that the consideration was inadequate.

In the case of *Duncan against Dodd,* 2 *Paige,* 99, the property sold at a master's sale for half its value. A resale was ordered on the condition that the petitioner gave sufficient surety to the master, that the premises should produce an advance of *fifty per cent.* And in this strong case the chancellor placed his decree upon the ground, that the property was the only dependance of two infant children, and that it was sacrificed through the misapprehension, or negligence, of their mother, or step-father.

After stating, that in such sales, it is essential to the interests of those whose property is sold, that purchasers should continue to retain full confidence in the safety of such purchases, and that they will not, as matter of course, be disturbed merely because a good bargain has not been obtained:—The chancellor said :

"If the defendants were adults, and the property had been sacrificed by their own negligence or inattention, I should not disturb the sale."

In the case of the *American Insurance Company vs. Oakley*, 9 *Paige*, 259, the property, consisting of two lots, was sold together, for the sum of $21,000, when, as the affidavits in support of the application stated, "the premises were worth, and would have brought, $10,000 more, if the same had been sold in parcels."

On this ground the sale was rescinded. But the chancellor said :

"If the premises had been put up and sold in parcels, I think it is not a case in which the court ought to have interfered with the sale, although the property was only sold for about two-thirds of its supposed value. ✱ ✱ ✱ ✱ ✱ If the property is duly advertised and fairly sold by the master, in the usual manner, *to a stranger to the suit*, mere inadequacy of price is not a sufficient ground for depriving the vendee of the benefit of his purchase, unless the inadequacy is so great as to be evidence of fraud or unfairness in the sale."

In *Williamson vs. Dale*, 3 *John. Ch. Rep.*, 290, the mortgaged premises were bid off at $2700, subject to a prior mortgage for the same amount; and the petitioners for a resale, stated the value of the property to be more than $12,000.

This sale was vacated on the ground of surprise. And *Chancellor Kent*, in pronouncing his decree, said :

"I wish to be distinctly understood, that I interfere on the ground of surprise, and that I do not lay any stress upon the alleged inadequacy of the auction price. Such a ground, unattended with other circumstances, is insufficient."

In the case of *Cohen against Wagner*, *(6 Gill.*, 97,) decided by the Court of Appeals, at the December term 1847, the property was purchased for $13,000; and the exceptant, in his application for a resale, averred, that the property was worth $20,000. The application was rejected by the court, and on the question of the alleged inadequacy of the auction price, they said :

"Under the third exception a third ground is relied on, for withholding the ratification of the sale, for $13,000, of property alleged to be well worth fifteen or twenty thousand dollars, or more. From the views entertained of the effect which would

result from the asserted inadequacy of price, if it, in truth, existed, it is deemed unnecessary to inquire, whether the assertion be sustained by proof? The practice of opening the biddings in chancery sales, upon the mere offering of an advance upon the purchaser's bid, has not been adopted in *Maryland;* and its non-adoption is founded on cogent reasons of justice and policy. The doctrine, that mere inadequacy of price in a chancery sale, where the sale has been made conformably to the powers and directions specified in the decree, is not of itself sufficient ground for vacating the sale, has been so frequently announced by the judicial tribunals of this State, that a special reference to authorities, to sustain it, is deemed unnecessary. A sale thus made will not be set aside, or its ratification refused, unless the court believe that such inadequacy was the result of fraud, surprise, mistake or unfairness in the sale." And in the concluding paragraph of the opinion, the court announce the principle, that to set aside a sale, upon the ground of mere inadequacy of price :

"It must be so gross and inordinate, as to furnish evidence of misconduct or fraud in the trustee."

This, unquestionably, is the sound and correct doctrine upon this subject. It is certainly true, that inadequacy of price is to be regarded as a strong auxiliary argument, in combination with circumstances calculated to cast doubt or suspicion upon the correctness of a sale. But standing alone, as it does in this case, it is insufficient to authorise an interference with the sale, unless, in the language of the court, in *Cohen against Wagner*, it is so inordinate, as to indicate some mistake or unfairness in the sale, for which the purchaser is responsible, or misconduct or fraud in the trustee, to whom the management of the sale has been committed.

In the answer of *Mr. Mayer*, one of the trustees, to the petition of the exceptant, he states: "That the sale was appointed positively to take place, after at least one postponement, and considerable delay on the creditor's part, and that he found on the day of the sale, that the creditor was peremptorily resolved on having a sale made, and he felt himself under a peculiarly strict obligation to effect a sale, even at a price materially be-

neath his estimate of the worth of the property. With this persuasion of his duty, and under the pressure of such a requirement, however painful the position, or the act, he allowed the estate to be struck off at the price of forty dollars per acre, as the highest bid, although, if left to his own discretion, and to conform to what he deemed the reasonable valuation of the property, he would not, he believes, have allowed it to be sold for a less price than sixty dollars per acre, that even being less than he deemed it actually worth.''

And this paper has been relied on by the counsel for the appellee as evidence, that in prescribing the terms upon which this sale was to be made, the trustee permitted his own judgment and discretion to be controlled by the creditor. It was exhibited in strong language to the court, as a written confession of indiscretion and misconduct in the trustee, which, if not mitigated by the consideration, that he acted under a gross misconception of his duty, would be regarded as amounting almost to official turpitude.

But we do not think that the conduct of the trustee is susceptible of this construction.

It appears that this debt was of long standing. That the property had been before twice advertised for sale, the last time on the 15th of October 1846. It is in proof, that on the last occasion the sale was postponed by the creditor, at the solicitation of the appellee, and upon his promise that the debt should be paid in six months, and under an assurance from *Mr. Donaldson*, that if the matter was not then settled, the property would be sold. And we are informed by one of the trustees, that it was within his particular knowledge, that the postponement of the sale advertised to take place, of Thursday, the 15th of October 1846, was assented to by the creditor, upon the undertaking of the petitioner, that no further delay should be asked.

The right of the creditor, under such circumstances, to demand that the property should be offered for sale at public auction, cannot be questioned. A refusal on the part of the trustee to comply with so reasonable a request, would have subjected him to detrusion from his office by the court who appointed him.

But in yielding to the requirements of the creditor, he reserved to himself the privilege, which he undoubtedly possessed, of guarding this property from sacrifice, by fixing a limit below which it was not to be sold. And it is a mistake to suppose, that the trustee, in limiting his *minimum* price at forty dollars an acre, submitted himself to the rule and will of the creditor. His answer does not justify such a conclusion, and in this act we can perceive no manifestation of either misconduct or unfairness. It would be an extraordinary proposition to maintain, that on a sale like this, it was the duty of the trustee to have designated a sum equal to the *maximum* value of the property, as the lowest price at which it should be sold. In *Cohen vs. Wagner*, where the sale was upheld, the *minimum* price fixed by the trustee was $12,500, in relation to property asserted to be worth $20,000.

It follows from the views thus expressed, that we think the judge below erred in setting aside this sale, and his order is therefore reversed.

ORDER REVERSED.