## ROBERT C. McLANE ET AL. *vs.* GEORGIANNA STULL McLANE.

*Judicial Sale—Suppression of Bidding.*

It appearing that, at an auction sale by trustees, held under decree of court, persons were induced to refrain from bidding by appeals to their sympathies, made by the person who subsequently became the purchaser at the sale, at a reduced price, who had lived on the property many years, and who thought herself unjustly treated by reason of a decision that she had but a limited interest in the property, *held* that the sale should be set aside.

*Decided February 13th, 1924.*

Appeal from the Circuit Court for Frederick County, In Equity (URNER, C. J., and WORTHINGTON, J.).

Bill by Robert C. McLane and others against Florence May Derr, Georgianna Stull McLane, and others, to determine the heirs of Helen Stull McLane, and for an accounting, etc. Sales of the property in dispute having been decreed, and a sale having been made to said Georgianna Stull McLane by the trustees appointed for the purpose, said plaintiffs filed exceptions, and from an order ratifying and confirming said sale, they appeal. Reversed.

The cause was argued before BOYD, C. J., STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Leo Weinberg,* for the appellants.

*Jacob Rohrback,* for Georgianna Stull McLane, appellee.

Boyd, C. J., delivered the opinion of the Court.

A sale was made at public auction by Messrs. Rohrback and Weinberg, trustees appointed by the Circuit Court for Frederick County, to Mrs. Georgianna S. McLane, of the properties described in these proceedings as parcel (1) and parcel (2), situated on the north side of West Patrick Street, in Frederick, Maryland, but, by reason of information received after the sale, Mr. Weinberg declined to unite in the report of sale, and filed objections thereto. The other trustee, Mr. Rohrback, reported the sale to that purchaser, and Robert C. McLane and others also filed objections to the ratification, in addition to those filed by Mr. Weinberg. It is not contended that the trustees, or either of them, or the auctioneer, did, or left undone, anything which would justify setting the sale aside, but it is claimed that Mrs. McLane, the purchaser of the two parcels, improperly induced others not to bid on them, and thereby acquired them for such prices and under such circumstances as called upon the court to set the sale aside.

Mrs. McLane is the widow of Harry O. McLane, deceased, and the mother of Helen Stull McLane, who survived her father and afterwards died intestate. By a decree of that court it was determined that the real estate of Harry O. McLane, who also died intestate, descended to his only child, Helen Stull McLane, subject to the dower right of her mother, and also subject to the dower right of her grandmother, Margaret J. McLane, who died in June, 1921. After the death of Helen Stull McLane, it was determined by the court that her interest in these properties had, under the statute of descents in Maryland in force at the time of her death, vested in Robert C. McLane and other descendants of her paternal great grandfather, subject to the dower of Georgianna S. McLane, her mother. Mrs. McLane was greatly disappointed, and it may be admitted, naturally so, at the decree of the court so holding, as she had lived in the property for a number of years and thought it vested in her. At a sale made by the trustees under the decree of the court,

she went to Mr. Theodore H. Alexander, who had gone to
the court house where the property was to be offered at pub-
lic auction, to bid on these two properties, which were sold
together.    According to his testimony, this occurred:  He
was asked why he did not bid at the sale and replied: "Well,
I came up the morning of the sale and sat down in front of
Judge Johnson's office, about half an hour before the sale
started.   I didn't know then it was Mrs. McLane.   I had
only seen her once at her place—she came over to me and
says 'Is your name Alexander?'  I said 'It is.'  'You buy
houses.'  I said 'I have been.'  She said 'Are you interested
in this place?'  I said 'I am.'  She said 'This is my home,
I have lived there a long time.  I would like to ask you not
to bid against me.'  I didn't say anything.  She said, 'The
lawyers in this case—the lawyers are trying to rob me out
of my home.  In some cases the law punishes robbers, but
in this case it seems as though it protects them.'  I said 'If
you look at it that way you won't be bothered by me,' so
that was the end of the conversation between Mrs. McLane
and myself."

He said that she and Mr. Derr approached him between
an hour and a half hour before the sale, and that if she had
not made that statement to him he would have bid on the
property; that he would have offered between $1500 and
$1600, and that with the assistance of his wife he was able
to buy the property at that time and pay for it according to
the terms of the sale; that he had spoken to his wife about
buying it, and had looked over the property about a week
before the sale and he owned a property across the street
from it.

Harry Nixdorff said he had made six or eight bids—his
last one being about $850 or $900.  In answer to what
stopped him from bidding and what took place between him
and Mrs. McLane, he said:  "A lady came over to me and
said, 'Do you know the widow is being robbed?'  'No,' I
said, 'If that is the condition I'll stop bidding.' "  He said

he was able to pay for the property; that he did not know
the lady, but there is in his evidence the following:

"Q. Did you later learn it was Mr. Derr's wife? A. I
understood so. Q. Mr. Daniel Derr sitting here? A. Yes,
he was the gentleman at the sale. Q. After she said to you,
'Do you know the widow is being robbed,' you said, 'If that is
the case I'll stop.' Then you did stop. A. I did. Q. (By the
Court): Is that all she said? A. I think that is all—just
a few words—more, maybe. She came over and thanked us
after that. Q. Which lady? Mrs. Derr? A. I think the
lady who told me to stop. Q. You don't know the property
now? A. Yes; I have been over and looked over it two days
after the sale. I thought it was very reasonable for $2,000
without the dower interest. Q. With the dower removed,
with the dower interest. Q. With the dower removed, with
the dower interest? A. $1,500 would be a fair price. Q.
(By Mr. Weinberg): You knew it was being sold subject to
the dower interest? A. Yes."

In his cross-examination this appears:

"Q. (By the Court): Did you say you wouldn't want the
property now? A. I wouldn't want it, not with the dower.
I would give $2,000 with the dower removed. Q. Would
you be a bidder on it under the same conditions? A. Not
unless the dower was removed. Q. (By Mr. Weinberg):
You would have bid that day if this lady had not said the
widow is being robbed? A. Yes, I would have. Q. (By the
Court): Why then and not now? A. I don't think I want to
own any property with a lady partner. She would be en-
titled to one-third of the property. Q. That same condition
existed at the time of the sale? A. I didn't look at it that
way the day of the sale. Q. You just bid on it because
Mr. Faubel said it was going very cheap? A. Yes.
Q. (By Mr. Rohrback): You did say you wouldn't want a
property with a dower tied up in it? A. I did say that, I
think. Q. (By Mr. Weinberg): If the lady had not inter-
fered you would have bid $1,500? A. Oh, I would have;
yes."

There was a Florence May Derr who was a defendant in the case in which the decree for the sale was made, and although she was there mentioned as a widow, we understand that she was the wife of Daniel Derr.

Mr. Weinberg testified that he did not know until the afternoon after the sale of the action of Mrs. McLane, when some one told him what had occurred between Mrs. Derr and Mr. Nixdorff, and that night he learned what had taken place between Mrs. McLane and Mr. Alexander; that he saw a son of Mrs. Derr talking to Mr. Ray at the time of the sale, but he did not then know what he said; that after the sale he congratulated Mrs. McLane and told Mr. Derr that he was glad she had the property, but that was before he heard of what had been done; that he had an offer since the sale from "H. A. Derr" (there is some confusion about the first name), the husband of Mrs. Florence May Derr, of $2,000 for the property, but he notified him the day before he (Weinberg) was testifying that he had changed his mind; that he had a bona fide offer of $1,500, accompanied by a certified check for $500, from John N. Lawler of Washington, whom he did not know personally. There is in the record an offer dated the 26th of August, 1922, signed by John N. Lawler, but that is for $2,000, subject to the widow's dower, and with that there is a deposit of a certified check of $500. Mr. Weinberg testified that he had not considered the price at which the property was sold to Mrs. McLane a fair one, but that he had felt, as the auctioneer did, that it was not fair to keep him (the auctioneer) there two or three hours when nobody was there to bid against Mrs. McLane. He said that none of his clients was present at the sale.

Elmer L. Ray said he attended the sale, and his last bid was either $860 or $840. He was asked to tell the court what occurred after his last bid and who came to him. He replied he did not know the gentleman, and this appears in his evidence:

"Q. (By the Court): Have you learned the name of the gentleman? A. No, sir, I didn't. He came to me; I was standing at the side of the door, and said 'Do you know how

you are buying this property?' I said, 'Like any other property, I suppose.' He said, 'No you ain't.' I said, 'Why?' He said, 'She has her interest in it and her life estate as long as she lives.' I said, 'If that is the case I am done,' and I didn't believe it then. I goes to the auctioneer and asked him if it was true, and he said 'yes.' I said, 'Well, I am done.' He looked at me after that and tried to get me to make another bid, but I didn't. Q. (By Mr. Weinberg) : This young gentleman told you she had a life estate? A. Yes, sir."

This is in Mrs. McLane's evidence:

"Q. Will you tell his Honor what you said? A. Mrs. Derr and I were sitting on a bench in that part of the park and saw Mr. Alexander across the street. I said, 'I believe I'll speak to Mr. Alexander.' I said, 'Mr. Alexander, you are interested in property in town.' He said 'Yes.' I said, 'Well, of course you know there is to be a sale today.' He said 'Yes.' 'Well,' I said, 'This has been my home for many years and I would like to buy it if it isn't run up on me too high.' I said, 'In some cases people rob and are punished,' and I said, 'In other cases they are robbed and not punished.' He said, 'If that is the case you will not be bothered by me.' I said, 'Thank you, Mr. Alexander.' I didn't see anything more of Mr. Alexander until after the sale, and I thanked him. I think Mr. Alexander understood it was my child's property that was being taken from me."

On her cross-examination she admitted that she knew that the court had passed a decree directing the sale of the property, and said, in answer to the question, "Why did you tell Mr. Alexander you were being robbed?" "Because no one has the right to a child's property ahead of the mother," and when she was asked, "In other words, you appealed to his sympathies?" she replied, "My purpose was that Mr. Alexander should know that I had been living there many years, and I felt I had a right to it and I wanted him to know that he could bid or not bid. I didn't ask him not to bid." Then she was asked, "Why did you tell him this if your object wasn't to arouse his sympathies or prevent his bidding?" and

replied, "I thought perhaps if Mr. Alexander knew I wanted the property he wouldn't bid against me." Then she was asked, "Why did you tell him you were being robbed?" and answered: "That is the way I felt." She was asked: "Did you speak to any one else who you thought might be interested in the property?" and answered: "Any one who I spoke to I said the same thing, 'I am going to buy the property if it is not run up too high.' " "And that you were being robbed?" to which she answered: "I used that a good many times—I told everybody who I spoke to, several persons."

The auctioneer said the sale was as fair a one in his judgment as he had ever made, but, as already stated, nothing was done at the sale by either of the trustees or the auctioneer which could be complained of. That, however, does not reach the objection raised by the exceptions. While the record is short and does not go into many particulars, it is apparent that, by reason of the decision of the court, there was considerable feeling between the plaintiffs, who were the successful parties, and the defendants, particularly Mrs. McLane, who doubtless felt that the decision was an injustice to her, but that could not be a justification of her resorting to the means she did to get the property as low as she did, as the court had decided the case in favor of the other parties, and against her. If the court was in error in its construction of the statute, she had the right to appeal to this Court, but neither the lower court nor this Court could have given her relief contrary to the terms of the statute, and it would be a dangerous precedent to ratify a sale to a purchaser who acquired property being sold by trustees at a reduced price, the result of such means as were adopted in this case. The lower court did ratify the sale and from that action this appeal was taken.

In 2 *R. C. L.* 1131, par. 16, the law is thus stated: "Sales at auction must be fairly and openly conducted. The great object of the rules regulating such sales and said to be founded upon reasons of public policy, is to secure a fair price to the owner or those interested in the proceeds of the property. This can be accomplished only by means of fair competition.

Just as the law protects the purchaser by condemning the practice of employing puffers to enhance the price, in like manner it protects the owner of the property and such persons as may be interested in the proceeds thereof by forbidding the stifling of competition among bidders, irrespective of the cloak under which it is accomplished, in order that those interested in the property may obtain the full equivalent therefor. Thus, where a purchaser by fraudulent representations prevents an attendance of bidders, or by means of appealing either to the sympathy or cupidity of the bidders, obtains the property for less than he otherwise would, the sale may be set aside. This is especially true where the purchaser has an interest in the land which is the subject of the sale and purposely resorts to such practices in order to obtain the property for less than he otherwise would be able to do."

And in 6 *C. J.* 830, the principle is thus stated: "Generally it may be said that any act of the auctioneer or of the party selling, or of third parties as purchasers, which prevents a fair, free and open sale, or which diminishes competition and stifles or chills the sale, is contrary to public policy and vitiates the sale. Thus a sale will be set aside where a person desirous of purchasing, prevents others by his improper conduct, from bidding against him, as where he chills the sale by an appeal to the sympathies of those present."

But it is not necessary to go outside of our own decisions to find the law on the subject. In *Chew* v. *Baker,* 133 Md. 637, Judge Burke, in speaking for this Court, premised his decision in that case, where there was a question similar to this, by saying: "It is proper to say that there is nothing in the record to justify any charge of fraud or bad faith on the part of anyone connected with the sale," and after referring to *State* v. *Brookes,* 2 Bland, 37, and *Wagner* v. *Phillips,* 51 Mo. 117, said: "These two cases, in which the facts are very analogous to those contained in this record, are based upon principles of fairness and justice, and sustain the decree of the lower court," which set the sale aside.

Without quoting at length from that opinion, it will be seen from the facts and law therein stated that the principles announced are very applicable to this. There one of those selected by the heirs of the former owner of the property approached Mr. Frazier, who had gone to the sale for the purpose of buying the property at a price considerably higher than it was sold for, had had "a full talk with him about the property and about the desire of the heirs to acquire it at the sale,"—the result being that Mr. Frazier did not bid on the property. Judge Burke also quoted from *Johnson* v. *Dorsey,* 7 Gill, 269, that "it is certainly true that inadequacy of price is to be regarded as a strong auxiliary argument, in combination with circumstances calculated to cast a doubt or suspicion upon the correctness of the sale." The Chancellor, in 2 *Bland,* 37, said, amongst other things: "In the present case, there does not appear to have been any fraud or combination, but if a sale under such circumstances, should be ratified, the encouragement which the precedent might afford, would probably operate not only against the interests of the parties concerned in sales, but against substantial justice and the reputation of this tribunal." The syllabus in *Chew* v. *Baker,* which we refer to for convenience, says: "When a purchaser keeps bidders away and suppresses competitive bids, it is justification for setting aside a sale in case of an inadequate price." See also *Neale* v. *Peverley,* 114 Md. 198.

Without further citations of authorities, or discussion of the facts, we feel constrained to reverse the order ratifying and confirming the sale to Mrs. Georgianna S. McLane, and remand the cause in order that the property sold to her may again be offered for sale.

> *Order of June 11th, 1923, reversed and cause*
> *remanded, the purchaser to pay the costs.*

Judge Thomas and Judge Pattison have examined the case and concur in the above opinion.