(Decided December 11th, 1895.)

## BENJAMIN F. DEFORD *vs.* JOHN MACWATTY.

*Receivers' Sale—Insufficient Advertisement of the Property to be Sold—Information to Purchasers—Terms of Sale—Exceptions to Ratification.*

If after a Receiver's sale has been made and reported to the Court for ratification, it is shown that the terms of sale prescribed by the order are of such a character as not to put the property fairly on the market, and in consequence thereof, it has sold for a depreciated price, thereby affecting injuriously the interests of all parties concerned, the Court will set aside such sale and order a resale on more favorable terms.

Such a sale will not be ratified, merely because the parties in interest failed to object in advance to the terms of sale prescribed by the order or decree.

When, owing to the neglect of the Receiver to give to purchasers full information as to the character of the property offered for sale, it sells far below its real value, the sale will be rejected.

When a going concern is sold by a Receiver, the debts due to it should not be included as a part of the assets, but these should be collected by the Receiver.

After a manufacturing establishment had been conducted prosperously by a Receiver for eight years, an order was passed upon his application directing him to sell at auction, as an entirety, all of the assets of the concern (except cash) including the good will, machines, merchandise and debts due to the concern. The successful prosecution of the business depended upon the right to use certain patents which were owned by a corporation of which the Receiver was President. No information was given in the advertisement as to whether the sale of the assets and good will of the concern carried this right or not. The concern had earned an annual net profit of $10,000 (after paying commissions of $5,000 a year to the Receiver); the stock of merchandise on hand was worth over $50,000; there were debts due to the concern amounting to $35,000; and there was a cash surplus in the hands of the Receiver of $50,000. No information was given by the advertisement of the extent and value of the business to be sold, and the Receiver refused to answer fully the letters of intending purchasers who made inquiries concerning the same. At the sale there were only two bidders, and the property was sold as an entirety for $50,000 to a person with whom were associated in the purchase parties related to the Receiver. *Held*, that this sale should be set aside.

Under the above mentioned circumstances the Receiver should have applied to the Court before the sale for an order ascertaining definitely just what rights the purchaser would acquire to the use of the patents which were essential to the operation of the business offered for sale.

Appeal from an order of the Circuit Court of Baltimore City (WRIGHT, J.), setting aside and vacating a sale made by the Receiver of the Gandy Belting Company. The sale was made under the following order of said Court: "It having been shown by the report of the Receiver this day filed that a sale of the entire partnership property in his hands is expedient, and it appearing to the Court that it is right and proper and will be for the benefit of all parties concerned that all the said property, together with the good will of the business of the said Gandy Belting Company, be sold, and no objections being interposed by either of the parties to the suit to the passage of this order, it is, this 11th day of July, 1894, ordered that Richard Cromwell, the Receiver appointed in this cause, do proceed to sell all the property and assets, not including cash on hand, of the

said Gandy Belting Company, and all property and choses in action in his hands as such Receiver, by public auction, to the highest bidder, in the month of October, 1894, at the factory or office of the said Gandy Belting Company, or at some other convenient place in the city of Baltimore to be selected by the Receiver after at least two months' notice of the time, place, manner and terms of sale given by advertisement published in at least two newspapers published in the city of Baltimore, and that the said property be sold by the said Receiver as an entirety, which sale to include the good will of the said Gandy Belting Company, all the machines, machinery and other chattels belonging to the said partnership, all raw material and all manufactured goods on hand at the time of the ratification of the sale, whether such manufactured goods be in the Receiver's possession or in the possession of agents by him employed, and all debts due or payable to the said Gandy Belting Company, or to said Receiver, as Receiver thereof, and all the property whatsoever (excepting cash on hand and money in bank) of the said Gandy Belting Company, as the same shall exist at the time of the ratification of the said sale ; subject, however, to the debts and liabilities of the concern contracted under the management of the Receiver. It is further ordered that the terms of the said sale shall be cash upon and at the time of the ratification of said sale, with authority to the Receiver to require at the time of the acceptance of the bid of any purchaser the payment by him of a deposit of ten thousand dollars."

The advertisement of sale referred to in the opinion of the Court was as follows:

" RECEIVER'S SALE OF THE MANUFACTURING PLANT AND PROPERTY OF THE GANDY BELTING COMPANY.

" In pursuance of an order of the Circuit Court of Baltimore City, passed in the case of *Maurice Gandy* v. *John MacWatty*, I shall sell by public auction, at the Real Estate Exchange Room, in Raine's Hall, corner of Postoffice avenue

and Baltimore street, in the city of Baltimore, on this day, the eighteenth day of October, 1894, at one o'clock P. M., the manufacturing plant and property of the Gandy Belting Company, now located at Nos. 728 to 734 West Pratt street, in the City of Baltimore, Maryland, the said sale to include the machines, machinery, fixtures and stock of merchandise, located as above stated, belonging to the said Gandy Belting Company, the good will thereof and all goods in the hands of agents of the Receiver throughout the United States, and the book accounts, bills receivable and all other assets of the said firm as the same shall exist at the time of the ratification of the sale, excepting cash and money in bank.

" Terms, cash. A deposit of $10,000 will be required at the time of the sale, the balance of the purchase money to be paid immediately upon the ratification of the sale. This is a rare opportunity to purchase a valuable and actively running business of established reputation, with everything needed for its prompt and advantageous prosecution, and is well worthy of the attention of manufacturers and capitalists. Richard Cromwell, receiver, Merryman & Pattison, auctioneers."

The appellee, MacWatty, filed the following exceptions to the ratification of the sale reported by the Receiver : 1. That said sale was improperly advertised, and no proper notice was given of the character, quality and value of the property sold. 2. That it was injudicious in said Receiver to sell said property as a whole, and it would have brought much more if sold in parcels. 3. That the terms of sale were harsh and unreasonable. 4. That it was improper in said Receiver to sell the bills receivable and open accounts, and that it was his duty to collect the same. 5. That said property was sold at a grossly inadequate price and would produce much more at a re-sale. 6. That the inadequacy of price is to be traced to doubts of the title of said property and the right to use said machinery, plant, etc., caused by the action of said Receiver in refusing to sell or offer for

sale the patent rights, covering the right to manufacture the Gandy cotton belting.    7. That said Receiver did not invite competition at said sale and sold to himself, indirectly, as president, director and stockholder of the Mount Vernon Company.    8. That he sold for the purpose of advancing the interests of the Mount Vernon Company, to the detriment of those of the parties to this cause.    9. That the purchasers bought with a knowledge derived from said Receiver, of which other bidders did not have the benefit.    And for other good and sufficient cause to be hereafter shown.

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, FOWLER, ROBERTS and BOYD, JJ.

*Francis K. Carey* (with whom were *John N. Steele* and *John E. Semmes* on the brief), for the appellant.

The first exception states that the property was not properly advertised.    Inasmuch as the Receiver published the advertisemeet, not only in the papers prescribed by the Court, but in a number of other papers, this exception must relate to the same matter as the tenth and twelfth exceptions, that is to say, it is not an objection to the time of the notice, or to the publication of the notice, but to the *form* and *contents* of the advertisement.    The foundation of the exceptions now under review are supposed to be about as follows :    First.    That the published advertisement should have given in greater detail the amount of the manufactured goods and raw material on hand, and the amount and character of the outstanding bills receivable, and open accounts. Second.    That the published advertisement should have stated in some way what the profits of the business were, past and prospective.    Third.    That the published advertisement should have stated in terms, that the Gandy patents were owned by the Mt. Vernon Company, but that the purchaser of the business would be authorized, as a matter of law, to manufacture the Gandy belt with or without paying any royalty to the Mt. Vernon Company.

The first, and it would seem the conclusive answer to all these objections on the part of the appellee, is that the order of Court under which the sale was made, and by which the appellee is bound as well as the Receiver and the purchaser, did not justify any of these statements. The second and equally conclusive answer is, that it would be a gross hardship upon all the parties, with the exception of the appellee himself, if a Court of Equity should permit a party to a cause to stand by for over three months, while the advertisement is appearing in the newspapers, without making or hinting at any objection whatever to the form of the advertisement, until after all the expenses of the sale had been incurred, after the purchaser had paid ten thousand dollars of his purchase money, and the rights of all the parties had become vested. Either these objections are after thoughts, or the appellee has lain in wait to spring them upon the purchaser who happens to buy against his will. But apart from questions of law, there is no reasonable foundation there for any of the objections.

Any statement made, either in the formal advertisement or by the Receiver himself, in regard to profits, would simply invite litigation and lay the foundation for a certain and possibly successful exception. No prudent officer of the Court would make any such statement, either by advertisement or otherwise, upon which a purchaser could claim that he relied. And even in the letter which the Receiver wrote to the representative of the Gandy Belting Company, Limited, which will be commented on hereafter, and which is supposed by the appellee to have been so objectionable, Mr. Cromwell was careful to say of the property that "its value depends on its management." A similar argument will, it is believed, satisfy the Court of the unreasonableness of the objection to the form of the advertisement, because it did not make certain statements in regard to the Gandy Patents and the right of the purchaser to continue the manufacture of the Gandy belt, with or without paying a royalty to the Mt. Vernon Company, which owned the patents.

Now, when the record is carefully examined, the Court will not only find that the Mt. Vernon Company has not made use of the possession of these patents to embarrass the sale, but that on the contrary, it has generously kept them in the background, and when the question of their purchase was adverted to by Mr. Walker, who was a possible purchaser, the Mt. Vernon Company offered, in case he purchased the Gandy assets, to sell him the patents if he wanted them for ten thousand dollars, or five thousand dollars less than the amount paid for them in cash, without reference to interest.

The legal theory advanced on the part of the Receiver during the controversy with the Gandy Manufacturing Company, and consistently maintained by him ever since, was, that the patented machinery having been made part of the partnership assets by Gandy, neither he nor any subsequent assignee of the patents could gainsay the right of a purchaser acquiring them through a judicial sale made for the benefit of the partnership creditors. It is submitted that this is the correct theory of the case, and therefore the right to use the machines must pass by the sale. Of course the ownership of the patents, if also acquired by such purchaser of the partnership property, might be availed of, so far as the patents are effective, to exclude or restrain competition; but his legal right, as a purchaser, to use the machines and carry on the business, seems unquestionable. Thus the Receiver, who had no power to sell anything that was not part of the assets, was justified in declaring, as he did in the advertisement, that the purchaser would take the business with everything needed for its prompt and advantageous prosecution. The purchase of the patents terminated a controversy which threatened to be very protracted, leading probably to an appeal to the Supreme Court, and whatever confidence was felt in the defence, it was beneficial to all concerned to have it ended thus speedily.

What is meant by the charge that the sale was made " in the interest of the Mt. Vernon Company " is not clear. The

Mount Vernon Company represented the entire indebted-
ness of the Gandy Belting Company, and was, therefore,
necessarily interested in the sale, and in having the property
bring an amount sufficient to pay its debt in full.   If, how-
ever, it is intended to charge the Receiver with colluding
with the Mount Vernon Company and the purchaser, so
that Mr. Deford might get the property for less than its real
value, it is only necessary to repeat that it is an unfair insin-
uation, and utterly unsupported by evidence.   Every line
of the record testifies to the vigorous and intelligent efforts
made by the Receiver to bring about a successful sale in
which he naturally took the greatest personal pride.

*Bernard Carter* and *Edward C. Carrington*, for the appellee.

The sale reported by the Receiver was properly set aside
because, while the business of the Gandy Belting Company
was that of manufacturing and selling belting made by the
patent process covered by the Gandy Patents, and it was
essential, therefore, for a purchaser to know whether, under
the sale of the machines, machinery, fixtures and the *good
will* of the Gandy Belting Company, the purchaser would
be entitled to have the right to manufacture under the Gandy
Patents, and if so, on what terms, and whether this right
was to be exclusive of a similar right in anyone else ; or
whether the right to manufacture was to be dependent upon
the will of the owner of the patents ; yet nothing was said
on this subject, either in the advertisement or in any other
information given to the public ; and no sale could be prop-
erly made without such information.

No sufficient description was given by advertisement, or
otherwise, of the character and value of the property to be
sold, nor of the extent of the business of said Gandy Belt-
ing Company, the good will of which was a part of the assets
to be sold.   The object of the advertisement of such a prop-
erty is to give such a description of the thing to be sold, as
will induce persons to buy the property ; whatever, there-
fore, would legitimately furnish such an inducement, should

be inserted in the advertisement. It has not fulfilled its design, when only a meagre or partial description is given in the advertisement, leaving other matters to be given orally or on special application. In the light of these principles, look at the advertisement in this case.

What answers were given to the request of the Providence Belting Co. for *pertinent information?* Instead of giving the information asked for, the Receiver says : " We would advise you that the *particulars* of the sale of *this business* are contained in the *advertisement* which is regularly inserted in our daily papers. As mentioned, the entire property as it may stand on date as advertised, with the exception of cash on hand, will be offered for sale ; just what this will aggregate in amount, is at this moment impossible for us to say, as our books will not be closed *officially* until about *the time of sale.*" And in the answer to the second letter, he says, " that inasmuch as our Receiver has never *been directed by the Court* to make up a statement showing the *profit and loss* of this business under his administration, he is not at the moment in a position to render *officially* a public statement such as you request ; but would advise that as soon after October 1st as we find *it expedient,* a statement no doubt will be made showing the *entire assets* of this concern as it may then stand, and PROBABLY at *time of sale* all questions pertaining to this business will be answered by authorized parties."

What confidence could this purchaser have, after these letters were received, that there was any desire to let it understand the real condition of the property (the main value of which was its capacity to make profit) was ? The Receiver is asked for " bread " of real information as to the past experience of the business in the way of success and profits ; he is given a hard " stone " in the shape of a reference to the advertisement which told *him nothing* he wished to know.

The result is, that for $50,000 Mr. Deford gets :

1. A business which, on his investment, would yield him

10 to 15 per cent. And the Receiver has declared that all that the business needs is *good management.*

2. In addition, he gets goods ready for the market, worth in money, at least.................. $67,000

3. He gets, in bills receivable, all open accounts good, and therefore money, over.......... 24,000

4. He gets, in duck, &c., over................ 4,500

$95,500

That is, in addition to a business which will pay him 10 or 15 per cent. on his investment of $50,000, he gets the sum of *$95,500* as a *bonus.* In view of all the circumstances of the case, can the Court hesitate to conclude, that such a result, if allowed to stand, would be the grossest injustice to those interested ; or can it doubt, that except *for the way things* were managed, the price list at the sale would have largely exceeded *the $50,000 ?*

*Arthur W. Machen* filed a brief for the Receiver.

ROBINSON, C. J., delivered the opinion of the Court.

The Court below was perfectly right, we think, in refusing to ratify the sale made by the Receiver in this case. Courts, for obvious reasons, always interfere reluctantly with sales of this kind or with judicial sales of any kind. And a sale made in strict conformity with the terms prescribed by the order or decree of the Court, will not as a general rule be set aside unless it plainly appears that the property was sold for an inadequate price, or unless there has been a mistake or surprise of some kind, or an omission of duty or misconduct on the part of the Receiver, or fraud on the part of the purchaser. The mistake or surprise, or omission of duty, or misconduct or fraud, such as will justify the interference of the Court in the rejection of the sale, will depend upon the facts and circumstances of each particular case. In dealing with all such questions, it must be borne in mind that sales of this kind are made by the Court through the Receiver as its agent, and made in behalf of the interests

of all parties concerned. And in some cases it is out of the question, in the very nature of things, for the Court itself to know in advance the terms and conditions best calculated to put the property most advantageously before the public to the end that it may sell for its fair market value, and in such cases the Court must rely in a measure upon its officer, the Receiver having charge of the property, for advice and information. And if the Court shall be fully satisfied that the terms of sale prescribed by the order or decree are of such a character as not to put the property fairly on the market, and in consequence thereof it has sold for a depreciated price, thereby affecting injuriously the interests of all parties concerned, the Court should not hesitate to set aside the sale and order a resale on better and more favorable terms. The purchaser in such a case has no just ground of complaint, because he knows that he acquires no title in the property until the sale has been ratified, and it is better, far better, that he should lose the benefits of a good bargain than that the parties in interest should suffer loss by reason of the improvident, and it may be unfair terms on which the preperty was sold. Objections to the terms of sale, it may be said, ought to be made by the parties in interest before the property is sold, but in some cases it may not be an easy matter to determine in advance how far and to what extent the terms prescribed may affect the sale of the property. The mere failure to make such objections would not in itself be a sufficient reason why the Court should ratify the sale, when it plainly appears that the sale was not fairly and properly made.

With these general principles to guide us, we come to the facts and circumstances under which this sale was made. Maurice Gandy, a subject of Great Britain, was the patentee of a process for manufacturing a machine belting made of cotton duck, for which he claimed merits superior to leather, rubber and other belting used for mechanical purposes. In 1883 he formed a partnership with John MacWatty and John H. Phillips for the purpose of manufacturing this belt-

ing according to his patented process in the city of Balti-
more.   This partnership having dissolved, Gandy and Mac-
Watty, on the 18th of May, 1885, formed a new partnership
for the manufacture of the same belting under the name of
the Gandy Belting Company.   The articles of co-partner-
ship provided for the payment to Gandy of a royalty of five
per cent. on the gross sales of each year, and in considera-
tion of that royalty the Gandy Belting Company was to
have the sole right to the use of the Gandy patents in the
manufacture of the belting.   In less than a year after the
articles were signed, upon a bill filed for the dissolution and
winding up of the affairs of the partnership, Mr. Richard
Cromwell was appointed Receiver of the assets and property
of the Gandy Belting Company.   He was at the time of his
appointment and is now the president of the Mount Vernon
Manufacturing Company, to which company the Gandy
Company was indebted in a sum exceeding fifty thousand
dollars for cotton duck supplied to it, and which was used
in the manufacture of the patent belting.   The business of
the Gandy Company was carried on, and the belting manu-
factured and sold by the Receiver from the time of his ap-
pointment in February, 1886, till July, 1894, a period of
more than eight years, when he reported to the Court that
the business since his appointment had been re-established
and put on a good basis, and that the property was then in
as favorable condition for sale as it could be expected to be
while in the hands of a Receiver, and suggested that it be
sold as an *entirety*.   Thereupon on the same day the report
was filed, an order was passed by the Court adopting the
precise terms suggested by the Receiver, directing him to
sell at public auction all the assets of the Gandy Belting
Company (exclusive of cash on hand), including the good
will of the company, all machines, machinery, chattels be-
longing to the partnership, together with all manufactured
goods in the hands of the Receiver or agents, and all raw
materials and all debts payable to the company or to the
Receiver, and all other property as the same shall exist at
the time of the ratification of the sale.

In pursuance of this order, the Receiver sold the assets and property of the Gandy Belting Company *as an entirety* at public auction, the advertisement following the terms of the order, to Benjamin Deford, for fifty thousand dollars. To the ratification of the sale thus made a number of exceptions have been filed by parties in interest, some of which it is quite unnecessary to consider. One of the main and, in our judgment, fatal objections to the ratification of the sale is the fact that neither in the order prescribing the terms of sale nor in the advertisement or in any other way was any information given to the public as to the right of the purchaser to use the Gandy patents in the manufacture of the belting, upon the use of which the successful manufacture of the belt absolutely depended. To no one was this better known than to the Receiver himself. He had during the entire eight years of his receivership used the Gandy patents in the manufacture of the machine belting, and while so using them a bill was filed in the United States Circuit Court in Maryland by the Gandy Belting Company, Limited, of England, the then owner of the patents, against him as Receiver, to recover royalty claimed to be due by him for the use of the patents, and to prevent the further use by him of said patents. Pending this suit the Mount Vernon Company purchased the Gandy patents of the English Company, paying therefor fifteen thousand dollars, and the Receiver still continued to use them in the manufacture of the belting. They were purchased by the Mount Vernon Company, he says in his testimony, in order that he might as Receiver " *continue the business*," and which " *otherwise might have been closed up at any moment.*" He knew then, it is clear, that the use of these patents by the purchaser was essential to the successful manufacture of the belting. In his answer to the bill filed by the Gandy Belting Company of England against him as Receiver, he claimed that the right to use the Gandy patents was part of the assets of the Gandy Company and subject to the claims of creditors, and would be a subject of sale in connection

with the good will of said business, and that it was out of
the power of Gandy or his assignees to deprive said cred-
itors of their equity. And further, he says he is advised
that the right to use said patents will also accompany the
factory and good will of the Gandy Company into the
hands of any purchaser to whom they may be sold for the
payment of the debts of said partnership. And even if the
said patent rights should not wholly and exclusively enure
to the benefit of such purchaser, the right at least to use
the very patented machines put into the partnership by
Gandy and thus constituting part of its assets, must go with
said machines, whenever sold and disposed of in the wind-
ing up of the partnership.

And then in his answer to the exception filed by Mac-
Watty to the ratification of the sale on the ground of inade-
quacy of price, because no information was given to the
public as to the right of the purchaser to use the patents,
he says " with regard to the patents, it would seem suffi-
cient to say, that the Court in disposing of the partnership
assets can only dispose of what is contained in those assets.
But the facts and circumstances of the case made it wholly
unnecessary to make any provisions as to the patent
rights." * * * " The principles of equity applicable un-
der such circumstances show, as the Receiver is advised that
the order of sale not only went to the utmost extent of the
jurisdiction of the Court, but provided for an advantageous
disposition of the partnership property." What were the
facts and circumstances that made it wholly unnecessary to
make any provision in the order of sale as to the right of
the purchaser to use the patents ? He knew the good will
and business of the Gandy Company was utterly valueless,
unless the patents could be used in the manufacture of the
belting, for he says they were purchased by the Mount
Vernon Company to enable him as Receiver to continue
the business, and that without their use the business might
be closed at any moment. And it is equally clear from the
answers filed by him as Receiver, that he was uncertain

what rights would pass to a purchaser of the good will of the business, and what would pass with the factory and machines.   In one answer he says the right to use the patents will go with the good will of the business, whether carried on at the old factory or not, and then he says the only right which the purchaser would get, would be the right to use *the very machines* now in the factory.   Under these circumstances we entirely agree with the counsel for the appellee, that it was vitally necessary for a purchaser to know whether he would be entitled to the use of the patents, and if so, on what terms, and whether this right was to be exclusive of a similar right in any one else.   And we agree, too, that it was the clear duty of the Receiver, in view of the uncertainty which he knew existed in regard to this right to use the patents as shown by his testimony and answers, to have applied to the Court by which he was appointed for an order ascertaining definitely just what rights the purchaser would acquire to the use of the Gandy patents.   And we cannot believe that the Court, if this matter had been properly brought to its attention, would have passed an order of sale without making a provision of some kind in regard to the rights of a purchaser under the decree.   We agree, too, that the proper time at which this matter should have been settled was before the order of sale was passed, but the failure to have these rights ascertained at that time, is no reason why a party in interest may not avail himself of the objection when the sale comes before the Court for ratification.

The failure to have the rights of the purchaser thus definitely ascertained, affected most injuriously, as the proof shows, the sale of the plant and good will of the business. As offered for sale by the Receiver, without any guarantee that the purchaser would have the right to use the patents, Mr. Phillips, who was himself a manufacturer of machine belting, says the plant and machinery was worth nothing more than so much old iron, and that he would not himself, nor would he have advised anyone else to have bid any

more for it.   And yet neither in the report of the Receiver suggesting the terms on which the entire assets and property of the Gandy Company should be sold, nor in the order of sale prescribing the terms and conditions of the sale, nor in the advertisement, nor in any other manner was anything said about the rights of a purchaser to the use of the patents, and without which the Receiver in his testimony says the business could not be carried on for a day.

But this is not the only objection on which the exceptants rely against the confirmation of the sale.   Here was a sale of the plant and good will of a business paying annually a net profit of over ten thousand dollars, the cost value of the plant amounting to $36,458.48, together with the stock of merchandise in the possession of the Receiver and in the hands of agents, of the value of over $50,000, and of bills receivable and debts due the company aggregating nearly $35,000.   And the proof shows that besides paying commissions of over five thousand dollars annually to the Receiver, and twenty-five hundred dollars a year to a manager, and all other expenses, there had accumulated in the hands of the Receiver, during the eight years of his management, a cash surplus of $50,000.   And yet neither in the advertisement nor otherwise, was any information given by the Receiver as to the character and value of the property to be sold, nor of the extent of the business, the good will of which was part of the assets of the company.   If competition was to be invited and the property brought to the hammer under the most favorable terms, then such information was absolutely necessary to enable bidders to form some judgment as to the value of the entire property.   And accordingly the Providence Belting Company, in its first letter, dated 29th August, 1894, requests the Receiver to furnish particulars as to the estimated value of the property, and debts on same, if any, and then asks the pertinent question, " *What does the property for sale consist of ?*"   And in reply, instead of furnishing the information and answering directly the inquiry, the Receiver contents himself with

saying, " that the particulars of the sale of this business are really contained in the advertisement," and then says " the entire property of this company as it may stand on date as advertised, with the exception of cash on hand, will be offered for sale; just what this will aggregate in amount it is at the moment impossible for us to say, as our books will not be closed officially until about the time of sale." And in a second letter by the same company, it asks the Receiver as to the amount of sales, expenses and net profits for the past year. Now what was the reply? The Receiver says he has never been required by the Court to make a statement showing the profit and loss of the business, and he is " not in a position at the moment to render officially a public statement such as you request."

Then again, Mr. Walker, who came all the way from Chicago for the purpose of getting information as to the assets and property of the Gandy Company, writes on his return home, October 1st, saying, " what we desire to know is the exact amount of the assets, including plant, machinery, outstanding accounts, and all other assets that will be sold at the Receiver's sale, as also the amount of net sales per annum for the last two years, and the amount of profit from the business during that time."

Now the proof shows that the Receiver had at his command all the information necessary to have answered these inquiries satisfactorily. While withholding the information from the Providence Belting Company and Mr. Walker, he furnishes by his letter of Sept. 13 this information to the Gandy Belting Company, Limited, of England. To this Company, he says, the profits for the past six years have averaged $10,000 per annum, "the books will show more profit;" with this knowledge on his part as to the annual profits, he declines to give this information in response to direct inquiry from the Providence Belting Company, and also from Mr. Walker.

Now, what was the result of this failure on the part of the Receiver to furnish the information thus requested as to

the character and value of the property which he had adver-
tised for sale, information which any prudent owner would
have been only too glad to have given in regard to his own
property.   The proof shows that the only two bidders for
this valuable property, paying more than ten thousand dol-
lars a year clear profits, were the Mount Vernon Company
and Benjamin Deford, the latter becoming the purchasers.
And it further appears that besides Mr. Deford, the osten-
sible purchaser, the other parties interested in the purchase
were Mr. Kennedy Cromwell, a son of the Receiver, and
the manager of the Mount Vernon Company, of which his
father was the president, and the Boone heirs, nephews and
nieces by marriage of the Receiver, all of whom are stock-
holders in the Mount Vernon Company, and one of them,
Mr. Kennedy Boone, being also a director.

But it is unnecessary to further consider the exceptions
relied on against the ratification of this sale.   The counsel
for the exceptants has made out quite an elaborate state-
ment for the purpose of showing that the property sold for
an inadequate price.   That it sold far below its market
value, and that this depreciated price was caused by the
failure on the part of the Receiver to put it fairly and
advantageously on the market, there cannot be any question.
We do not, however, rest our judgment on mere inadequacy
of price, but on the ground that there has been a plain
omission, misconception or neglect of duty, call it what you
please, on the part of the Receiver, in the sale of this prop-
erty, and in consequence of which it sold far below its fair
value.

We deem it proper to add, that we cannot approve of so
much of the order of the Court below as directed the Re-
ceiver to sell at public auction the bills payable and all other
debts due the company.   This indebtedness amounted to
over thirty-five thousand dollars, scattered all over the
country, and no bidder could form even a probable estimate
as to the value of these debts.   And besides, the purchaser
was to get only such debts as remained uncollected by the

Receiver at the time of the ratification of the sale.   How was it possible for anyone to tell what amount would remain uncollected at some uncertain time in the future.    The better course was to have directed the Receiver to collect the out-standing indebtedness and to account for the same as part of the assets of the company.

*Order affirmed with costs.*

(Decided December 11th, 1895.)