## THE SOUTH BALTIMORE BRICK AND TILE COMPANY *vs.* JOHN E. KIRBY—WYATT OWEN *vs.* JOHN E. KIRBY.

*Receivers' Sales—Right of Stockholder to File Exceptions—Private Sale Made When Public Sale was Directed—Subsequent Higher Offer—Rights of Purchaser—Opening Biddings—Evidence— Costs.*

A stockholder in an insolvent corporation may be allowed under some circumstances to except to a sale of the property of the corporation made by receivers.

Receivers directed by a consent-decree to sell property at public sale reported for ratification a private sale at the best price they had been able to obtain after much effort. After their agreement to sell, an offer of a higher price was made to the receivers by responsible parties. *Held,* that such private sale should not be ratified, there being a certainty of actual competition.

Where receivers directed by decree to sell at public sale make an agreement to sell at private sale, the faith of the Court is not pledged to

the purchaser, and he has no such right to ask for ratification of the sale as has a purchaser at public auction in conformity with the decree.

After a public sale of property made in accordance with the terms of the decree, the biddings will not be opened because a higher price is subsequently offered, but this rule does not apply to a sale not made at auction, or not made after an attempt to sell at auction in accordance with the decree.

Where receivers directed to sell property at public sale deem it advantageous to make a private sale, the proper course is to ask for an order in the proceedings to show cause why the private sale should not be authorized.

Upon exception to a private sale of property made by receivers, without being thereunto authorized, evidence that responsible parties have subsequently made higher offers for the property is admissible to show that a public sale would not be a mere experiment but that fair competition might be anticipated.

Where receivers acting in good faith make a private sale of property which they were directed to sell at public sale, which sale is ratified by the Court below, but is set aside upon appeal, the costs of the case will be directed to be paid out of the proceeds of the re-sale.

A decree appointing trustees to sell property of a corporation, made by consent of the parties, directed them to sell the real estate, &c., dividing the same in such manner as they should deem best, and to give at least three weeks' notice thereof by advertisement. The trustees, without having advertised any of the property, sold one lot of ground at private sale, reporting to the Court that it would be for the advantage of the estate if this private sale should be made in lieu of a public auction ; that a public auction would not realize as much ; that they had diligently endeavored to sell said lot, employing brokers and enlisting the services of certain mortgagors of the property, who were still liable upon covenants, and that the best offer received for said lot was that which they had accepted and reported for ratification. After this agreement to sell was made, a higher offer for the property accompanied by a part payment, was made to the receivers. *Held,* that the sale so made should be set aside and a re-sale made at public auction.

Appeal from an order of the Circuit Court for Baltimore County (BURKE, J.), overruling exceptions to the receivers' sale reported in this case, and finally ratifying and confirming the same.

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, ROBERTS, PEARCE and SCHMUCKER, JJ.

*Thomas R. Clendinen*, for the South Baltimore Brick and Tile Company, appellant.

*Oscar L. Quinlan*, for Wyatt Owen, appellant.

*David G. McIntosh* and *Thomas Foley Hisky*, for the appellee.

Pearce, J., delivered the opinion of the Court.

In this case are presented two appeals in one record, from an order of the Circuit Court for Baltimore County ratifying a sale of a tract of land made by trustees and receivers appointed by a decree of that Court, for the sale of the property of the South Baltimore Tile and Brick Co., an insolvent corporation. The case was submitted for decree without testimony upon the following agreement: " It is agreed that the above case be submitted for decree, and that the above decree is a proper decree to be passed in this case." The Court thereupon passed the decree agreed on, appointing Stevenson A. Williams, John P. Horsey and George M. Sharp " trustees to make sale, and receivers of said property, and of said corporation," and directed that they should " sell the real estate and plant of said corporation, dividing the same in such manner as they should deem best, and make such terms as to payment as in their judgment may be most advantageous, and they shall give at least three weeks' notice thereof by advertising in a newspaper published in Baltimore County, and in one published in Baltimore City."

The debts of the corporation are from $60,000 to $70,000, and its property consists of six lots of land near the middle branch of the Patapsco River, aggregating 83½ acres, but the only lot here involved is Lot No. 7, on Warner's Point, opposite to Ferry Bar Bridge, in Baltimore City, and on the Shore Line Railway, containing 16½ acres. It contains large deposits of fine clay for brick-making and a large plant for this business, which has been carried on there, but the plant has been neglected and is of little value. The lot is

shown to be of great value for an excursion resort, the adjoining lot having been successfully used for that purpose for some time.    It has also two large wharves extending to navigable water, and is thus accessible both by rail and water.    The trustees have never advertised any of the property as directed by the decree, but on the 2nd of February, 1898, sold Lot No. 7, at private sale, to John E. Kirby, for $18,000, of which $500 was paid in cash, $4,500 was to be paid on ratification of sale, and the balance to be secured by mortgage on the lot, payable in instalments in one, two and three years, with interest at five per cent. from date of mortgage.    On February 26th, 1898, the receivers and trustees filed a " petition and report " setting forth that they believed it would be for the advantage of their estate if there could be a private sale of Lot No. 7, in lieu of public auction, and that a public auction would not realize as much as a private sale ; that they had diligently endeavored to sell said lot, employing brokers, and enlisting certain mortgagors of the property who were still liable upon covenants ; that the best offer received for said lot was $18,000 from said Kirby, who states he will use it as a summer resort ; that larger sums were at one time suggested, but no formal offer made beyond that of Kirby ; that they believed the price fair and reasonable, and submit the affidavit to that effect of two experienced brokers, and they then " pray leave to make private sale without advertisement, and for authority to accept said offer, and, leave of the Court being first had and obtained, to file this as their formal acceptance of said offer and report of sale to said John E. Kirby."    On the same day, the Court, without notice to any of the parties to the proceedings, passed an order accordingly authorizing the sale made, to be reported for final ratification.    On March 29th, 1898, Wyatt Owen filed a petition showing that he was a stockholder in the defendant corporation, and praying to be made a party in order that he might except to the sale, and the Court passed an order accordingly.    On the same day he filed exceptions to the sale reported.    On April

9th, 1898, Julia R. Warner and others, the mortgagors heretofore mentioned as liable on their covenants and parties to the decree, filed exceptions identical with those of Owen, and on April 21st, 1898, the defendant corporation also filed exceptions. Testimony was taken, and the exceptions were all overruled, and the sale was ratified. From this order, overruling these exceptions and ratifying the sale, Owen and the defendant corporation have both appealed, but the Warners have not appealed. The exceptions of Owen may be condensed as follows: 1st. That the private sale made, was in violation of the terms of the decree. 2nd. That the price was inadequate, and much less than public auction would have realized. 3rd. That the chief value of the property consisted in fine clay for brick-making, of which the general public was never informed by advertisement or otherwise. 4th. That an offer of $20,000 on better terms had been made by a responsible party since the attempted private sale.

The exceptions of the defendant corporation are in substance: 1st. That as the decree and its terms were fixed by consent, a private sale without advertisement is in violation not only of the terms of the decree but of the consent which fixed those terms. 2nd. That those who wished to bid on the property at public auction had no opportunity to do so. 3rd. That even if private sale were proper, none but the reported purchaser had opportunity to make a private bid. 4th. That the price was grossly inadequate; and 5th. That the sale was not fairly made. The appellees' first contention is that neither of the appellants has any interest in the proceeds of this sale, and therefore neither is entitled to maintain these exceptions. It cannot be doubted that, ordinarily, stockholders are represented by the corporation or that receivers of corporations are, in ordinary cases, the proper persons to assert or defend the rights of the corporation or of its stockholders and creditors. But this is not an ordinary case, since it is the conduct of the receivers themselves, in dealing with the property of the corporation, and of the stockholders, which is the ground of these exceptions. The

corporation was originally a party and of course a necessary party to these proceedings.    Owen was the president of the corporation, and its majority stockholder when the receivers were appointed.    The fact that the corporation is insolvent, and that no pecuniary interest can accrue either to it or to Owen from the proceeds of a resale, or of this sale, cannot divest Owen as president or as stockholder of the interest which, as an honest man, and a faithful officer, he should feel in realizing for its creditors the largest possible results. Beach in his work on *Receivers,* page 371, says : " Stockholders or bondholders should not be allowed to intervene except under circumstances which rarely, if ever, occur." The circumstances of this case are rare, and we think Owen was properly made a party for the purpose of enabling him to except to this sale.    The cases of *Warfield* v. *Ross,* 38 Md. 85, and *Griffith* v. *Hammond,* 45 Md. 85, relied on by the appellee, merely decide that persons whose interests in mortgaged property will not be affected by a sale thereof under a power, or under a decree to which they are not parties, cannot except to such sale; and the case of *Glenn, Trustee,* v. *Williams,* 60 Md. 116, simply states the general doctrine that in ordinary suits against a corporation, stockholders are not proper parties.    On the contrary, in *Wagner* v. *Cohen,* 6 Gill, 97, Cohen, who was a stockholder in the Holliday Street Theatre, which had been sold under a decree, filed exceptions to the ratification of the sale, and also a petition to restrain the reported purchaser from using the theatre while the exceptions were pending, and the Court held on this petition that, though his interest as a stockholder was merged in the decree, he retained an interest in the proceeds of sale, and was entitled to institute that proceeding; and in the succeeding case of *Cohen* v. *Wagner,* 6 Gill, 179, the exceptions just mentioned were heard and determined without question by counsel or Court.    We shall not hesitate, therefore, to consider the case upon the merits.

The general principles which must control all such cases are too familiar to require consideration.    We have only to

apply them to the facts of this case with such sound and
just discrimination as we may, though the task is not
wholly free from difficulty.    Much of the testimony we do
not think it necessary to consider, nor do we regard the
testimony of Mr. Haman and Mr. Owen, the chief wit-
nesses, as in any serious conflict.   The general exceptions to
the testimony of Owen are not sustained by the produc-
tion of any authority, and we can perceive no reason for its
exclusion; nor of those portions of his testimony detailing
interviews between himself and Judge Sharp and Mr. Wil-
liams—which were specially excepted to.   These gentle-
men, as receivers, are direct parties to the inquiry now under
consideration, and could have testified, had they thought it
necessary to do so.   The offer of Hunecke and Meeter
we think is competent testimony, to show that a resale is
not a "mere experiment," but that there is reasonable
ground for anticipating fair competition at such resale.   In
*Wickes* v. *Westcott*, 59 Md. 282, where a bidder at a sale,
excepting to a ratification thereof, said, " he presumes he
will advance his bid upon a new offer of the property "—
the Court said : " This is equivalent to saying such is his
present purpose, and is, perhaps, as positive as one should
be forced to speak."   Here Meeter and Hunecke have *cov-
enanted for a definite advance,* and it is to be presumed
they will adhere to that purpose.   Our decision will be
based upon what we understand to be undisputed
facts, and the first important fact is, that the form and
*terms of the decree* were the *result of consent,* for it can
hardly be supposed, that if the receivers agreed upon had
proposed that a decree should be passed providing for pri-
vate sale without advertisement, that this would have been
assented to either by the defendant corporation or its cred-
itors, who were parties to the proceedings, or without such
resistance as Owen might have been capable of offering.
The decree plainly directs a public sale in requiring "at least
three weeks' notice *thereof* by advertisement."   The purpose
of advertisement is to let the public know what, and what

manner of property is brought into market.   *Kaufman* v. *Walker*, 9 Md. 240.   " The direction of a decree requiring advertisement is perhaps more essential to the safety of persons interested in the sale than all others, *because, unless public notice is given, competition, so indispensable to the disposition of property at its full value, can never, or very rarely, be secured.*"   *Glenn* v. *Wootten*, 3 Md. Ch. 394.   " No deviation from the terms of a decree is more obnoxious to objection than selling at private sale, when the decree directs a public sale."   *Latrobe* v. *Herbert*, 3 Md. Ch. 377.

We do not question, where the terms of the decree have not been fixed by the consent of parties, and the acceptance of the Court, that such provisions as are directory merely and relate to the mode of enforcement, may be modified by the Court.   *Dawes* v. *Thomas*, 4 Gill, 333. We might perhaps go farther, and say that even where terms not merely directory have been agreed on by the parties and accepted by the Court, they *may* still be modified by the Court, in some emergencies, though we are not to be understood as so deciding—but it would not follow if we did so hold, that we must approve the modification of this decree, *when* and *as made* by the Circuit Court.   In *Kelso* v. *Jessop*, 59 Md. 114, a public sale was directed by testator's will and also by the decree passed in aid of the will, and the Court there said that while the provision of the will in that respect did not deprive the Court of *all discretion* over the sale, yet it was not to be disregarded altogether in passing upon the question of the ratification of the sale reported, and this, too, where a public sale had once been attempted before reporting a private sale.   The Chancellor's burden of judgment in this respect is transmitted to us with this appeal, and we are bound to act as if the property were our own, or held by us in trust.   That is to say, " reasons which would induce us, as proprietors, or as trustees, to set aside a sale made by our agent, should determine us, discharging the duties of a Chancellor, to refuse our approbation to a sale made by a trustee."   *Andrews*

v. *Scotton*, 2 Bland, 638. The appellees, upon this point, cited in their brief from *Tyson* v. *Mickle*, 2 Gill, 383, the following language of JUDGE DORSEY: " Had the trustees, instead of accepting the offer and making the sale as they did, reported the aforegoing facts to the Chancellor, and asked his permission to sell the property on the terms proposed at private, instead of public sale, as directed by the decree, can it be doubted that he would have granted the authority they solicited? We think not." But it will be remembered that there the property had been previously twice offered at public sale pursuant to the decree, and the distinction thus indicated is broad and fundamental. In *Tyson's case*, if the trustees, without ever advertising, had asked permission to accept the offer which they did accept, upon no better foundation than fruitless efforts to dispose of it upon better terms at private sale, can it be doubted that the Chancellor would have refused the authority they sought ? We think not. We think the safe, and under the circumstances of this case—in view of the high character and experience of these receivers—the proper course would have been to pass an order upon the petition of the trustees to show cause why a private sale should not be authorized. Had this been done, it would have resulted in producing to the Court below, *before definite action taken by it, and before the acquisition of any supposed rights by the contemplated purchaser*, all the facts we now have before us, and we feel confident in that situation, the Court below would have withheld the authority it granted.

Let us see briefly what are the facts disclosed by the testimony, and we shall rely chiefly upon the testimony of Mr. Haman, which has strongly impressed us by its fullness and fairness. None of the three receivers were called to testify. Their duties seem to have been performed by their counsel, Mr. Haman, whose personal and professional relations were close with the receivers, as well as with some of the larger creditors, and it is proper to say that he appears to have discharged them with great industry and energy

and with the strictest integrity and fidelity. He has detailed the various efforts he made from time to time, personally through the intervention of brokers, and of Mr. Henry Warner, who was interested in behalf of his nieces, to secure a purchaser; his efforts to have the railway extended to this property and so enhance its value as an excursion resort, and his communications with George A. Meeter, who carried on an excursion resort on the adjoining lot. He states that Meeter agreed with him that he was the natural purchaser for the property, and always said he would give him better than anyone else would, and that if he would wait till the fall of 1897, he would give him $24,500, which, with his commission of $500, would make the price asked, $25,000; but that when the fall came, Meeter failed to comply with this promise, and only offered $16,000, which he declined, and ceased having any further transactions with him, but always advised Mr. Henry Warner of anything like an offer received, and requested him to let Meeter know of it, as he felt sure Meeter wanted the property; that he gave Owen one week to find a purchaser from $20,000 up, promising him a commission of 2½ per cent. if he sold it; that outside of the pecuniary interest his friend Mr. Williams had in it, and his own strong interest for the Warner heirs, he had done everything a man could do to dispose of this property, and we will here say that we are satisfied this is literally true *as to effecting a private sale.* He further states that he knew Meeter specially wanted four or five acres next to his lot; that he knew the land to be of excellent brick quality, and a magnificent site for an excursion resort, for which it has special value; that he told Owen in December, 1897, the great objection to putting it up at auction was that up to that time there was apparently only one bidder, and that was Meeter. He denies that Owen ever made him any offer for the property prior to the sale to Kirby, and says that they would not under any circumstances have accepted an offer from Owen, because he knew him to be insolvent, and though backed by Meeter he

could recede from his offer any day ; that he was thoroughly satisfied with Meeter's financial responsibility, and had no doubt Meeter and Owen would have carried their proposition through, *if they had had a chance.* He also states that sometime subsequent to December, 1897, Kirby opened negotiations for the purchase, and Mr. Warner was requested to inform Meeter of them all ; that Kirby suggested other figures less than $18,000, and that he believes Meeter was informed of all these suggestions ; that Kirby, like Meeter, only wanted four or five acres for a resort, but he told him, as he had told Meeter, that he must take all, or leave all ; that finally Kirby said he would make a fast offer, provided he would accept or reject it at once ; that Kirby knew his previous suggestions had been carried to Meeter, and it was then agreed that if Kirby would make a final offer it should be at once accepted or rejected, and not be used with Meeter as the basis of a bid from him ; that Kirby thereupon offered $18,000, and it was accepted; that after such an acceptance he could not in honor accept or entertain a higher bid, and the receivers were bound to defend the sale to Kirby.   Mr. Owen testifies that he first learned from Mr. Haman, on February 7th, of this sale to Kirby, five days after it was made, and immediately addressed a letter to Mr. Haman, set out in the record, stating that he would have very favorably entertained a proposition to him of $20,000 ; that he was going that day to a hospital to undergo an operation, and on getting out, would be prepared to guarantee an advance on $18,000.

On March 24, 1898, Owen and Meeter made a written agreement (also in the record), that if Owen became the purchaser of this property, Meeter would purchase from him 4½ acres at $12,000 cash, and would furnish him that amount to be paid the trustees on Owen's purchase.   On April 19th, 1898, Owen tendered the trustees a certified check of Meeter's to their order for $1,000, as a deposit on the $20,000 offered them, and repeated his offer made earlier in that day, of $12,000 cash and balance in one year on

mortgage at 6 per cent. On May 9th, 1898, Meeter and E. D. Hunecke (both of whom are conceded to be responsible), addressed a communication to the receivers, covenanting under seal, if the sale to Kirby were set aside, and the property put up at public auction, to bid at least $20,000, and agreeing that the certified check for $1,000, before mentioned, and which had been filed in the case, should be treated as deposited on that offer, and on the 18th of May the receivers laid this communication before the Court without recommendation, stating, however, that they were satisfied these parties were able to perform their offer.

It has been necessary thus to extend this opinion by reference to the testimony in order that there may be no misunderstanding as to the facts upon which it is based. We have already said that we are satisfied Mr. Haman, who was practically an acting receiver, exhausted all reasonable effort to effect *a private sale*—but the receivers never attempted and apparently never contemplated a public sale and this we think was a serious error. However well founded may have been the belief, when Meeter appeared to be the only bidder in view, that it would be unwise or disastrous to expose the property to public auction, yet when Kirby came forward the situation was instantly changed, and there was every assurance of an active competition between two bidders each of whom was known to desire at least the most valuable part of the property, and for the same purpose. Nor could there have been better assurance of Kirby's recognition of this fact than his requirement that his bid should not be made known to Meeter because he would raise on it. The result, therefore, of the acceptance of Kirby's bid, under such circumstances, was not to secure a desirable purchaser when there was no hope of competition, but was to exclude an actual competition, which, at public auction, was as fully assured as ever could be. Can we doubt, then, that if the situation, as thus disclosed by the indisputable testimony, had been known to the Court below when it gave permission to make the private sale, reported,

that it would not have been given; and if it ought not and would not then have been given, should it not now be .revoked, and the public sale which should then have been ordered, be ordered now ? We feel ourselves driven to this conclusion.

It is argued, however, that the rights of Kirby as a purchaser in good faith have attached, and that the faith of the Court is pledged to their maintenance. But Kirby, while a purchaser in good faith, made his offer with constructive, if not actual, knowledge of the terms of the decree which required a public sale. His offer was for a private sale, and was designed by him to exclude the competition which he feared, and which public auction was designed to secure. We fully agree with the receivers, that having pledged *their* faith to the acceptance of Kirby's offer, they were not at liberty in honor to reject it and accept a higher bid—but their obligation does not extend to the Court. The faith of the Court is only pledged to a sale in all respects in conformity with the terms of the decree, and by the execution of which no injustice is worked to the parties. As was said by C. J. ROBINSON in *Deford* v. *McWatty*, 82 Md. 168 (which was a receiver's sale): " The purchaser knows that he acquires no title in the property until ratification, and it is better, far better, that he should lose the benefits of a good bargain, than that the parties in interest should suffer loss by the improvident, and it may be unfair, terms on which the property was sold." It is also said, to set aside the sale would practically be to open the biddings, which has never been permitted in Maryland, as settled in *Cohen* v. *Wagner*, 6 Gill, 251, and *Kelso* v. *Jessop*, 59 Md. 121. But the setting aside of this sale cannot be so construed, and is not to be understood as questioning the recognition, or impairing the obligation of that rule. It is manifest that the biddings meant under the English practice, and under the Maryland cases cited, are public biddings; and in both those cases the property had been offered at public sale in conformity with the decree and the biddings which were not

permitted to be opened—though at a private sale—were after the market had been tried at public sale. It is only rights acquired under biddings made *upon or after* public sale and open competition, which are never to be affected by advances made after their acquisition.

It is also argued that receivers are not, like executive officers, bound to sell at the highest price without regard to the purchaser, and for this we were cited to the case of *Knotts* v. *Receivers of Canal*, 4 N. J. Ch. 423 ; but it does not sustain the contention in this case. There the decree was not for a sale, but for a lease of the canal, and the receivers reported a lease to A. & B. subject to the approval of the Court. Knott filed exceptions setting forth that he had offered a much higher rental, with proper security, which the receivers had rejected. On proof taken, it appeared that the principal business of the canal was carrying coal; that its bridges, aqueducts and locks needed large and skilled repairs, which the lessees were bound to make, and that A. was a coal dealer and B. was a civil engineer, which considerations determined their selection at a lower rental, and the Court held that the receivers had acted with proper discretion, under those circumstances.

Finally it was said, that to order a re-sale would be a " mere experiment" which would probably produce a far less price, and that such experiments have been forbidden in *Garrittee* v. *Popplein*, 73 Md. 322. But the testimony in this case does not warrant the conclusion that a re-sale would be a mere experiment. Looking to the record we see no reason why Kirby and Meeter should not be competitors at a re-sale as they would have been when Kirby's bid was made, if the sale had been at auction. We were told in argument by appellee's counsel that Meeter has died since the hearing below, but it was replied by appellant's counsel, that he had left an ample estate, and his representatives or heirs were continuing his business at the same premises, and it may be fairly presumed the same inducements would operate upon them. In *Lawson* v. *The State*,

2 Bland, 643, sale had been made under a consent-decree upon terms different from what might have been expected from the expressions in the decree, and in the opinion setting aside the sale CHANCELLOR HANSON used the following language, which we adopt as applicable to this case : " We believe, from a careful examination of all the proof, that they acted according to their judgment as faithful trustees, but we cannot for a moment doubt that their judgment was erroneous, even if the land should not hereafter command a higher price than they sold it for." Courts always reluctantly and cautiously disturb sales made in good faith by their agents, but, for the reasons stated, we feel constrained to set aside this sale. We shall therefore reverse the order of the Circuit Court and set aside the sale, and will remand the case for a re-sale at public auction in conformity with the terms of the decree. All the parties concerned having acted in good faith, the costs of this case above and below will be borne from the proceeds of the re-sale.

> *Order reversed and sale set aside. Cause remanded for a re-sale at public auction in conformity with the decree. Costs in this Court and in the Court below to be paid out of the proceeds of the re-sale.*

(Decided March 14th, 1899).

McSHERRY, C. J., dissented.