ELMER S. STALLINGS ET. AL *v.* ANNAPOLIS
SAVINGS INSTITUTION ET AL.

[No. 6, April Term, 1934.]

*Decided April 26th, 1934.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Robert Moss,* for the appellants.

*James M. Munroe,* for the Annapolis Savings Institution, appellee.

*George Renehan,* submitting on brief, for Pierce J. Flanagan, appellee.

PATTISON, J., delivered the opinion of the Court.

The appellants, Elmer S. Stallings and Lyda R. Stallings, his wife, were in the year 1931 seised and possessed of a number of tracts of land lying and being in Anne Arundel County, upon which they, on the 6th day of March of that year, executed a mortgage to the Annapolis Savings Institution, a body corporate, to secure

the repayment of a loan of $30,000, made to them by said institution. The mortgagors defaulted in the payment of the mortgage indebtedness, and the property was, under the mortgage, advertised to be sold upon the premises on the 21st day of June, 1932. Upon that day, James M. Munroe, the attorney named in the mortgage, sold five of the lots for $26,000 unto one Pierce J. Flanagan, he being, at that price, the highest bidder therefor. The sale of these lots was reported to, and finally ratified and confirmed by, the court. In the report of sales it is shown that lot No. 4, consisting of 7.92 acres of land, at the request of the mortgagors was not sold, in order that they might pay the balance due on the mortgage, after applying the proceeds of the sale of the lots sold to the payment of the mortgage debt, taxes, costs, and expenses of sale.

By an account stated, it is shown that the amount owing on the mortgage debt and interest, after applying thereto the proceeds of sale of the said five lots, less expenses, taxes, and costs of sale, was $7,271.89. This amount was not paid, and lot No. 4 was again advertised to be sold, this time at the courthouse door in Annapolis, on October 25th, 1932. On this occasion, as alleged in the attorney's second report of sale, the property was offered "in the presence of a large concourse of people," and the highest bid received therefor was $26,000, made by one Byer, who stated, after the other bidders had dispersed, that he had bought the property for one Logisky of Brooklyn, New York, "who would be on hand at twelve o'clock to make the necessary arrangements to pay for the property." Mr. Munroe, the attorney, "waited until two o'clock in the afternoon" of that day, but "no Mr. Logisky appeared to consummate the sale. The bidder, Byer, professed to be very indignant at the failure of his principal to appear * * * as promised, and said that he would go immediately to Baltimore and take up the matter and produce the purchaser in a day or two." Mr. Munroe "proceeded at once to write to Mr. Logisky according to the name and address given to him, informing him of the state of the facts, but has never received any

answer to said letter, although the same was sent in an envelope with the address of the sender duly printed thereon."

After this unsuccessful attempt to sell the property, it was again advertised to be sold at the courthouse door in Annapolis, on November 29th, 1932, at 11 o'clock a. m. When offered on that day, the highest bid received therefor, $10,200, was made by Pierce J. Flanagan, to whom the property was sold at that sum, and reported to the court.

To the ratification of this sale, the mortgagors filed exceptions on the grounds (1) that the price offered therefor was grossly inadequate; (2) that the property was improperly advertised as a "peremptory" sale, which was not authorized by the provisions of the mortgage; (3) that several persons, presumably the purchaser, and his father and brother, under the pretense "that they were interested only in helping the mortgagors in their efforts to repurchase their home, * * * combined to bid upon the property and to obtain the same at a price much less than one-half its real value for themselves or for some one of them"; (4) "that at the attempted sale of this property on the 25th day of October, 1932, this same combination of persons bid $19,000.00 for this identical property, while at the peremptory sale of November 29th, 1932, the same persons purchased the same property for Ten Thousand and Two hundred dollars ($10,200). An answer was filed to the exceptions, and, after a hearing thereon, the court passed the order finally ratifying and confirming the sale so made. It is from that order this appeal was taken.

It was said in *Johnson v. Dorsey,* 7 Gill, 294: "Inadequacy of price * * * standing alone * * * is insufficient to authorize an interference with the sale, unless * * * it is so inordinate, as to indicate some mistake or unfairness in the sale, for which the purchaser is responsible, or misconduct or fraud in the trustee, to whom the management of the sale has been committed." This statement of the law has been consistently followed by this

court in its many decisions since rendered. *Warfield v. Ross,* 38 Md. 92; *Gould v. Chappell,* 42 Md. 473; *Bank of Commerce v. Lanahan,* 45 Md. 412; *Loeber v. Eckes,* 55 Md. 3; *Dircks v. Logsdon,* 59 Md. 178; *House v. Walker,* 4 Md. Ch. 63; *Garritee v. Popplein,* 73 Md. 326, 20 A. 1070; *Chilton v. Brooks,* 69 Md. 584, 16 A. 273; *Boyd v. Smith,* 127 Md. 364, 96 A. 526; *Shirk v. Soper,* 144 Md. 276, 124 A. 911; *Hunter v. Highland Land Co.,* 123 Md. 644, 91 A. 697.

The evidence offered as to the value of the property differs widely, as in most of these cases. Stallings testified that he gave $6,000 for the land and expended $15,000 in the erection of the dwelling house and other buildings thereon, including the garage. The evidence is that the buildings erected by Stallings in 1929 and 1930 could have been built at the time of the sale for one-half of that amount, $7,500. It was testified by others that the actual value of the property at the time of the sale was so much as $20,000. But all of those testifying stated that there was little or no sale for property at that time. This being so, it was difficult, if not impossible, to find sale for it at its value, and we do not think that the sale of this property, at the amount returned by the attorney named in the mortgage, was so grossly inadequate, or inordinate, as to warrant us in holding that it indicated some mistake or unfairness in the sale for which the purchaser was responsible, or misconduct or fraud in the attorney to whom the management of the sale had been committed.

It therefore follows that the court should not interfere in the sale so made, unless, in addition thereto, facts and circumstances be shown which are calculated to cast a doubt or suspicion upon the correctness of the sale. As was said in *Johnson v. Dorsey, supra*: "Inadequacy of price is to be regarded as a strong auxiliary argument, in combination with circumstances calculated to cast doubt or suspicion upon the correctness of a sale." To justify the court in setting aside this sale, something must be found in the acts or omissions of the attorney

making sale of the property, or the purchaser of it at such sale, or in some fact or circumstance connected therewith, causing the property to sell for less than it would have otherwise sold for. The record does not, we think, disclose any acts or omissions of the parties named, or any facts or circumstances, having the effect mentioned.

One of the facts complained of is that the property at this sale was advertised as a peremptory sale; when, as claimed by the exceptants, the mortgage did not authorize it to be so sold. This was after it had once been offered, resulting in an abortive sale, caused largely, if not altogether, by the acts of the mortgagors. This action on the part of the attorney named in the mortgage resulted from the conduct of the mortgagor, Stallings, and those employed by him, in the unsuccessful attempt to sell the property on October 25th, 1932. At such attempted sale Stallings had Byer and another party, unknown to those of that community, and who, we may infer from the record, were irresponsible parties, to attend this sale for the purpose of "protecting him" in the sale of the property by bidding an amount far above its value, thereby losing the benefit of an alleged *bona fide* bid of $18,000. What was meant by the term "peremptory sale," no doubt, was that, after the failure to sell on the earlier date, for the causes stated, the attorney wished it to be understood that the property would positively be sold, and that the sale would not be defeated by similar acts of Stallings or those aiding and abetting him. It does not appear from the evidence that the use of the term "peremptory sale" was in any way injurious or prejudicial to the interest of the mortgagors, or that it in any way injuriously affected the sale of the property, nor can it be inferred from its use that they were injured or prejudiced thereby.

As to the third exception, we find no evidence whatever to support it. It is true, so far as the record discloses, the idea of not selling lot No. 4 at the sale of June 21st, 1932, originated with Patrick Flanagan, the father of the

purchaser, and it was he who suggested to Mr. Munroe, through Mr. Linthicum, that it be not sold at that time, in order to give to the mortgagors an opportunity to pay off the balance of the mortgage and save their home. This idea of Mr. Flanagan arose from a kindly feeling he had for the mortgagors. He was at that time living near them and was frequently visited by Stallings. There is nothing in the evidence showing the existence of any selfish combination, consisting of himself and sons, to become the owner of this property to the detriment of the mortgagors. It was only after the filing of exceptions to the ratification of the first sale of June 21st, 1932, in which these charges were made against him and his son, that he ceased to have anything further to do with the mortgagors, and he did not attend the subsequent sales.

The fourth exception is based upon the alleged fact that, at the abortive sale of October 25th, 1932, the alleged combination, including the purchaser at the sale of November 29th, 1932, bid so much as $19,000 for the property, while at the later sale its bid was only $10,200, at which sum the property was sold. There is no evidence of any probative value found in the record that the father or either of his sons ever made a bid of $19,000 for this property. The only evidence in relation thereto, worthy of consideration, is that of Edward L. Flanagan, one of the brothers, who attended the sale of October, 1932, and stood by Mr. Renehan, the bidder for his brother, and directed him when to stop bidding. He testified that he stopped bidding when the bids had reached around $10,000. Upon cross-examination the witness was asked: "How much did your brother bid at that sale? A. He did not bid at all. Q. Anybody bid for him? A. I was standing along side of Mr. Renehan telling him how high to bid. Q. How high did you tell him. A. We dropped out shortly after ten thousand dollars ($10,000.00)" There were, of course, others bidding, as the property was knocked down at $26,000 or $28,000; some of the witnesses saying at $26,000 and others $28,000. It is evi-

dent from all the evidence that the bidding became very spirited between Byer and the other stranger until the seriousness of the bidding was more or less questioned. This being so, the evidence as to when the serious or *bona fide* bidding stopped and the other started is very uncertain. It is, however, stated by some of the witnesses that there were *bona fide* bids around $17,000, or $18,000, but the evidence as to this is unsatisfactory.

The record shows that there were a number of judgments, liens upon the property, subsequent to the mortgage, aggregating a considerable sum. They were held by parties well able to purchase the property if by so doing they could have protected their judgment claims. These judgment creditors were present at the sale, and they allowed the property to be sold to the purchasers at a price claimed to be far below its value. This fact in itself is entitled to much force in contradicting the claim made that the price at which the property was sold was inadequate. It might have been better had the attorney, after receiving what is claimed to have been a *bona fide* bid of seventeen or eighteen thousand dollars from some one present at the sale of October 25th, if such a bid was actually made, not to have sold the property at the price at which he sold it, but it is by no means certain that this would have brought better results. The property was adequately advertised, and there was no complaint as to the scarcity of persons attending the sale. There were present, as we have said, those who had liens against the property, and it would have been to their interest to have bought it, if the price at which it was sold was inadequate, and yet they did not bid. The attorney has no better offer for the property, and it is not known that he will have one within a reasonable length of time. The fact that he did not postpone the sale, with all the uncertainties as to the result of such action, does not warrant us in saying that the attorney erred in judgment in selling the property at that time.

As we find no error committed by the trial court in refusing to set aside this sale, the order will be affirmed.

*Order affirmed, with costs.*