JOHN R. RIGHTER ET AL. *v.* JOSHUA CLAYTON
[No. 6, October Term, ,1937.]

*Decided November 4th, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Solomon Hirschhorn,* with whom were *E. Gardner Ziegler* and *Louis J. Sagner* on the brief, for the appellants.

*Joshua Clayton,* submitting on brief, for the appellee.

SHEHAN, J., delivered the opinion of the Court.

This is an appeal from an order of the Circuit Court for Cecil County, overruling and dismissing exceptions to the ratification of a sale, made under power and authority in a mortgage from Thomas D. Mews, deceased, unto James E. Dean, and assigned unto Joshua Clayton,

who proceeded to advertise and sell the property in a foreclosure proceeding. The property is known as 104 East Main Street in the Town of Elkton in Cecil County. The exceptions are filed by John R. Righter and Alfred S. Righter, an infant, grandnephews of the deceased.

There survived Thomas D. Mews a sister, a brother, a niece, and the following grandnephews and grandnieces: Martin Robosson, Wilmer C. Ford, Alma Joseph, and Helen M. Ford, and the two grandnephews who filed these exceptions, who are appellants herein.

It is urged by the appellee that, the appellants being grandnephews, and there being a brother, a sister, and a niece living, these exceptants have no right or interest in the mortgaged property after the death of Thomas D. Mews, and are, therefore, not entitled to file these exceptions. It is apparent that, if this contention is correct, this appeal should be dismissed, and, unless the statutory enactments passed after the decision in the case of *Hoffman v. Watson*, 109 Md. 532, 554, 72 A. 479, changed the law as it then existed, these exceptants are not proper parties. That was a well considered case. It was argued and then re-argued, but it was directly held by a majority of the court that grandnephews, under the state of the law at that time, had no interest in real property as against brothers, sisters, and nephews. We would be compelled to dismiss this appeal unless there have been statutory enactments that so changed the law from that existing in the year 1909, when that case was decided, as to vest in grandnephews an interest in the decedent's property. Such changes, we believe, have been made by Acts of Assembly affecting the devolution of both real and personal property.

It was the intention and design of the Legislature, in passing the Acts of 1916, ch. 325, secs. 1, 2, 3, and 4, to bring into accord the law relating to both these classes of property, and that the law governing the distribution of personal property should apply equally to both real and personal property with respect to decedent's estates. But the amendatory acts go further than that.

The Acts of 1916, ch. 224, repealed and re-enacted sections 126, 127, 128, and 129 of article 93 of the Code of Public General Laws of Maryland, 1911, and these re-enactments are incorporated in article 93 of the present Code of Public General Laws (1924) in the same order as is contained in the Act of Assembly, 1916, and are designated as sections 131, 132, 133, and 134. In the Code of 1904, which existed at the time of the decision in *Hoffman v. Watson, supra,* the above provisions appeared different in number as to sections, but the same in verbiage as in the Code of 1911.

In the case of *Hoffman v. Watson, supra,* the questions as to the devolution of both real and personal property were involved, and at that time the provisions relating to inheritance and descent of real property were considered, and it was there held, because of the proviso at the end of section 27, article 46, entitled "Inheritance," subtitled "Descents," that grandnephews and nieces did not share with nephews and nieces, these latter taking, by representation, the share of their parents, but it was not so held with regard to personal property. It is from this pronouncement of the law that the appellee in this case contends the grandnephews and nieces are now excluded. To this contention we cannot subscribe, in view of the state of the law as it now exists. Sections 133, 134, and 135, article 93, are those that govern the situation with which we are here concerned, and are as follows:

"133. If there be a brother or sister or a child or descendant of a brother or sister and no child, descendant, father or mother of the intestate, the said brother, sister or child or descendant of a brother or sister shall have the whole."

"134. Every brother and sister of the intestate shall be entitled to an equal share, and a child or children of a deceased brother or sister of the intestate shall stand in the place of such brother or sister and a grandchild or grandchildren and every other descendant or other descendants of a deceased brother or sister of the intes-

tate in existence at the death of the intestate shall stand in the place of his, her or their deceased ancestor."

"135. After children, descendants, father, mother, brothers and sisters of the deceased, the child or children, grandchild or grandchildren of brothers and sisters of the deceased and their descendants, all collateral relations in equal degree shall take, and no representation amongst such collateral shall be allowed, and there shall be no distinction between the whole and half blood."

For convenience, section 27, article 46, Code of Public General Laws (1904) is here set forth: "If in the descending or collateral line, any father or mother shall be dead, the child or children of such father or mother shall by representation be considered in the same degree as the father or mother would have been if living, and shall have the same share of the estate as the father or mother, if living, would have been entitled to, and no more; and in such case, when there are more children than one, the share aforesaid shall be equally divided among such children; provided, that there be no representation admitted among collaterals after brothers' and sisters' children."

Section 135, before amendment, appeared in the Code of Public General Laws (1904) as section 130, but was repealed and re-enacted by the Acts of 1912, ch. 91, sec. 129, and now reads as above indicated. Thus the laws as contained in sections 133, 134, and 135 are brought into harmony and clearly indicate an intention to repose by representation in grandnephews and grandnieces the same rights of property as would have been possessed by their deceased ancestor, if living at the death of the intestate, and, this being true, the exceptants in this case have such right or interest in the property of their granduncle, Thomas D. Mews, upon his death, as entitle them to file exceptions in this case.

Sections 133, 134, and 135 should be read and construed together. By the very terms of section 134, grandchildren of a brother or sister of the deceased take and stand in the place of his, her, or their deceased ancestor,

and by direct implication from the terms of section 135, grandchildren who are grandnephews of the deceased take in preference to other collateral relations. Thus, by direct provisions in section 134, and implications in section 135, grandchildren of deceased sisters and brothers, being grandnephews of the decedent property owner, may become entitled to an interest in the property of a granduncle. The exceptants in this case are the grandnephews of Thomas D. Mews.

This conclusion does not dispose of this appeal, because on the record the facts as presented in the motion do not justify the reversal of the lower court, which declined to set aside the sale and dismissed the petition and ratified and confirmed the sale. The chancellor in his opinion did not deal with the question above considered, but evidently accepted these grandnephews as proper parties.

The appellants excepted to the ratification of the sale on the grounds: First, "That the said property was sold for a grossly inadequate price"; second, "That the said sale was unfairly made because the Auctioneer for the said Assignee, making the said sale, having full knowledge of the fact that certain parties were interested in bidding on the said property at said sale, failed to properly notify said parties of the said sale, the said parties being non-residents and having been promised by him to be notified of the sale within ample time to be present and attend the same"; and, third, "For other reasons to be assigned at the hearing of these exceptions."

Taking up these exceptions in their order, it is obvious by the most casual reading of the testimony that the price obtained for the property was a reasonable and fair one. Witnesses acquainted with the value of real estate in Elkton, who had no interest whatever in the sale or in the property, testified that $2,300 was a fair price for the property as it then stood, and it was shown that the property was purchased by Mr. Mews in 1919 for $2,350, since which time there had been no substantial changes in value of real estate there, and that the property had

been suffered to become badly out of repair since 1919, and that the purchaser of the property has spent considerable sums on repairs, since the sale, in making it suitable for occupancy. This testimony, with no material contradiction, is quite conclusive as to its value. There are no facts in the record that would justify in any way the setting aside of the sale on the ground of inadequacy of price.

The rule has been definitely stated, and adhered to through numerous decisions, that a sale will not be set aside because of mere inadequacy of price, unless the price be so unreasonable as to indicate a lack of judgment and discretion, or misconduct, on the part of the trustee in making the sale. Mere differences of opinion do not justify the interposition of a court of equity in refusing to ratify a judicial sale made in good faith and without misconduct on the part of those interested or having in charge the sale of the property. Gross inadequacy of price, collusion, fraud, and mistake, are all matters upon which affirmative relief of a court of equity may be invoked for the benefit of those having an interest in the property sold.

One of the most recent cases on the subject is *Stallings v. Annapolis Savings Institution*, 167 Md. 4, 172 A. 283, 284. There it was stated, quoting from *Johnson v. Dorsey*, 7 Gill 269, 294: "Inadequacy of price * * * standing alone * * * is insufficient to authorize an interference with the sale, unless * * * it is so inordinate, as to indicate some mistake or unfairness in the sale, for which the purchaser is responsible, or misconduct or fraud in the trustee, to whom the management of the sale has been committed." And this rule has been adhered to and consistently followed by this court in many decisions. *Glenn v. Clapp*, 11 G. & J. 1; *Cohen v. Wagner*, 6 Gill 236; *Johnson v. Dorsey*, 7 Gill 269; *Gibbs v. Cunningham*, 1 Md. Ch. 44; *Hintze v. Stingel*, 1 Md. Ch. 283, 284; *House v. Walker*, 4 Md. Ch. 62, 63; *Hubbard v. Jarrell*, 23 Md. 66; *Warfield v. Ross*, 38 Md. 85; *Horsey v. Hough*, 38 Md. 130, 137; *Gould v. Chappell*, 42 Md.

466, 467; *Bank of Commerce v. Lanahan, Trustee*, 45 Md. 396; *Mahoney v. Mackubin, Trustee*, 52 Md. 357; *Loeber v. Eckes*, 55 Md. 1; *Dircks v. Logsdon*, 59 Md. 173; *Chilton v. Brooks*, 69 Md. 584, 16 A. 273; *Condon v. Maynard*, 71 Md. 601, 18 A. 957; *Garritee v. Popplein*, 73 Md. 322, 20 A. 1070; *Shaw v. Smith*, 107 Md. 523, 69 A. 116; *Hunter v. Highland Land Co.*, 123 Md. 644, 91 A. 697; *Boyd v. Smith*, 127 Md. 359, 364, 96 A. 526.

The principle above stated is further elaborated by Judge Offutt in his opinion in *Shirk v. Soper*, 144 Md. 269, 277, 124 A. 911. See, also, *Kelso v. Jessop*, 59 Md. 114; *South Baltimore Co. v. Kirby*, 89 Md. 52, 42 A. 913; *Mason v. Hubner*, 104 Md. 554, 65 A. 367.

A further review of the evidence on this point is not necessary. In fact, the record is peculiarly lacking in testimony, either as to inadequacy of price, lack of attention, or misconduct on the part of Mr. Joshua Clayton. These charges are not in any measure supported by the evidence.

The contentions of the exceptants, evidently prompted and promoted by Messrs. Friedman and Silver, who took a prominent part in this proceeding, is that the auctioneer had promised Friedman and Silver to notify them when the sale would take place and, in accordance with this promise, which was not made on the part of the assignee or by his authority, was, nevertheless, fulfilled by the auctioneer, who wrote to them in ample time for these persons to attend the sale, but the letter arrived on a religious holiday and was not received in the usual course. Friedman, however, called over the phone on the very day of the sale, and shortly before the sale, and requested that the sale be postponed. The auctioneer testified that he informed Mr. Friedman that he did not think it was possible to postpone it, but that if he would give him a bid he would see that it was put on the property. This Friedman did not do but, some days after the sale was made and reported, Friedman and Silver came to Elkton, promoted these exceptions, and have stood, according to the testimony, sponsors for them. The

auctioneer, Mr. Garrett, is a responsible citizen, the owner of property, an auctioneer in good standing, and is a county commissioner of Cecil County, and his testimony is not to be lightly discredited. Upon receiving this call over the phone from New York, he promptly notified Mr. Clayton of it, just prior to the sale, and of the request for the postponement. Mr. Clayton did not know these persons, had never, at that time, seen them, and was not informed as to their financial worth, responsibility, or character. Certainly under these circumstances the assignee could not be expected to postpone the sale, disappoint the bidders who were there, and rest upon the uncertainty that he would ever hear from these strangers again, or that he would ever receive a price equal to that which he might then be offered. There were a large number of interested or prospective purchasers present, and there was considerable bidding on the property, which was finally sold for $2,300. Much of the testimony in the record relates to Friedman's statements concerning his visit to Mr. Clayton in Elkton after the sale had been made and reported, and with the auctioneer, who had no authority, express or implied, to bind the assignee to notify these persons or to agree to postpone the sale. There is much conflict in the testimony between Mr. Clayton and Mr. Garrett on the one side and Friedman on the other; but even to accept the testimony of Mr. Friedman and Mr. Silver in full would not warrant setting this sale aside. The testimony of the exceptants themselves is brief, of little effect, and inconclusive.

From what we have said the decree must be affirmed.

*Decree affirmed, costs to be paid by appellants.*